# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION


| | | |
|---|---|---|
| Derek Williamson | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 3:13-cv-00219 |
| v. | ) | Judge Friedman / Frensley |
| | ) | |
| Kevin Genovese[1], | ) | |
| Respondent. | ) | |


## REPORT AND RECOMMENDATION

In July of 2009, a jury in Sumner County, Tennessee convicted Derek Williamson ("Petitioner") of first-degree premeditated murder for his killing of Grady Carter. Following his conviction and direct appeals, Petitioner attempted to have his conviction reversed but was denied relief by the Criminal Court of Sumner County, the Tennessee Court of Criminal Appeals, and the Tennessee Supreme Court. Having exhausted his attempts to seek relief in the state courts, Petitioner now alleges that several errors committed in those proceedings violated his rights under the United States Constitution. Specifically, Petitioner requests that this Federal Court find his conviction in Tennessee violated his Sixth and Fourteenth Amendment rights to present a defense, to a jury trial, and to have effective assistance of counsel. *See* Docket No. 1, pages 6-19; *see also* Docket No. 7, pages 3-11; *see also* Docket No. 31, pages 4-8.

For the reasons set forth below, the undersigned recommends that habeas corpus relief be DENIED.

---

[1] Previously but no longer on record as Respondent, former Wardens: Henry Steward, James M. Holloway, and Debra K. Johnson.

# I. Background

The facts underlying Petitioner's case are as follows:

This case arises from the June 18, 2008 shooting death of Grady Carter ("the victim") in front of his house in Westmoreland.

. . .

The victim and Adrian Holmes began dating in 2001 and were parents to their son Peyton, who was born in 2005. The family lived together in the Ridgecrest Subdivision of Westmoreland, and they had an intimate group of friends in Westmoreland with whom they frequently socialized and traveled, including the Defendant. However, in August 2007, the relationship between the victim and Holmes ended. Holmes moved out of the family home into an apartment. By mutual agreement, she and the victim shared custody of Peyton, with his time split equally between them during the week and on weekends.

Later in the fall of 2007, Holmes began dating the Defendant, and in November of that year, he moved in with her. The victim was upset with this arrangement and with the relationship in general between Holmes and the Defendant. Though he never expressed to Holmes that he wanted to kill the Defendant, he often told her that he wanted to "kick his ass." The victim never physically harmed the Defendant, but over a period of months from November 2007 to April 2008, he often harangued the Defendant with text messages, in which he would call the Defendant profane names and tell him that he "[couldn't] hide forever; your day is coming." However, the text messages ceased in May 2008.

Three days prior to the shooting, the Defendant received some forwarded messages from the victim that Holmes had sent to him, in which she stated that she might be willing to put the family back together and that she was sorry for the problems she had caused the victim. One message also included a picture she had sent the victim of she and Peyton. Two days before the shooting, the Defendant and the victim met at a local bank, at the victim's suggestion, to discuss the messages from Holmes and what they actually meant. During the meeting, the victim asked the Defendant about his relationship with Holmes and whether they had been having problems. The victim told the Defendant that Holmes had been showing up more often at his house under the guise that she had forgotten something, or she stayed longer when dropping off or picking up Peyton. The Defendant admitted to the victim that he and Holmes had been having difficulties over her phone "and the way she had acted about her phone." The Defendant and the victim also discussed their relationship. The victim told the Defendant that "he was still pissed" and that he was never going to forget it or forgive him.

The day before the shooting, the Defendant and Holmes had a heated argument, which resulted in the Defendant's decision to move out of the apartment. Holmes

2

told him that she did not want the relationship to end, but he felt she was not honest with him and was only telling him what he wanted to hear. He felt it would be best if they split up for a while. He did not, however, move out of the apartment.

On the afternoon of the shooting, Holmes and the Defendant talked about their plans for the evening. Holmes wanted to see a movie at the drive-in, but the Defendant wanted to have pizza and beer at home. Holmes obliged, and they spent the evening at home. Later, she received a video message from the victim of Peyton catching lightening bugs. The Defendant was in the room with her when she got the message and could hear Peyton's excited voice on the video. He asked her who had sent the message, and she told him that the victim had sent it. They then argued about the victim sending her video messages. Holmes expressed to the Defendant that it was entirely appropriate for she and the victim to have this kind of contact involving their son, particularly because they each only saw him part of the week, and the Defendant grabbed her phone from her and threw it across the room, shattering the screen. The Defendant then stormed down the hall to the bathroom, punching a hole in the wall on his way.

When the Defendant exited the bathroom, they argued more about the messaging between the victim and Holmes. Holmes then called the victim and asked him to talk to the Defendant about the nature of these messages. The victim told Holmes that he was going to keep sending these messages, and he did not care what the Defendant thought about it. The Defendant refused to speak to the victim. The victim then called the Defendant's cell phone, but he did not answer it. The victim left a voice mail, in which he told the Defendant that he could not get angry over anything the victim had done and that if the Defendant did not like it, "he would find [him] and he'd kick [his] ass."

The Defendant then stormed into the kitchen, picked up his loaded gun from the kitchen table, looked back at Holmes, and said, "I hope you're happy; you just got him killed." The Defendant subsequently took off in his car. Holmes tried to reach the Defendant on his cell phone, but he did not answer. She tried to call the victim, but his phone went directly to voice mail. She then reached the victim's cousin, Shawn Carter, who lived down the street from the victim, and told him that the Defendant was upset and headed to the neighborhood. She asked him to get Peyton out of the house. Holmes finally reached the victim and told him that the Defendant was upset and had a gun. She asked him to take Peyton and go to Shawn's house. He said that he would take Peyton but refused to leave his house.

After getting Holmes's call, Shawn Carter walked down the street to the victim's house to get Peyton, and he took Peyton back to his house to stay with his wife. He then walked back to the victim's house to make sure nothing happened, but he did not really believe the Defendant would show up. When he got there, the victim was outside on the phone, talking loud and cussing. Shawn and fellow neighbor, Beau Troutt, who had walked toward the victim's house because

3

Shawn's wife had called him with concern, went over to Todd Rollin's house, who lived across the street. Rollin had come out of his garage, and the three of them talked briefly in Rollin's yard. Rollin told Shawn and Troutt that he did not want to be involved in any of this but to call him if they needed him. The victim then walked over to Shawn and Troutt and said that he had been waiting for this for a long time. He told them that he was going to kick the Defendant's ass if he got there. The victim had no weapon on his person or in his hand.

Several minutes later, the Defendant's car was heard coming around the corner. After he entered the subdivision, he pulled in front of the victim's driveway. The victim threw up his hands and said, "What's up?" The Defendant then opened his car door, pulled out a gun, and fired several shots at the victim. After the first few shots, the victim fell to the ground. Shawn Carter then ran to the Defendant's car, opened the passenger door, and yelled at him about what he was doing. The Defendant did not acknowledge him, put the car in reverse, and took off. Shawn pushed the car door shut with his foot as the Defendant sped away.

*State v. Williamson*, No. M2010-01067-CCA-R3CD, 2011 WL 3557827, at *1-3 (Tenn. Crim. App. Aug. 12, 2011). Petitioner turned himself into police the same evening. *Id.* at *3.

In August of 2008, Petitioner was indicted by a Sumner County Grand Jury. *Id.* The case then went to trial in July of 2009. *Id.* at *1. Following his trial, the jury found Petitioner guilty and Petitioner was convicted of first-degree premeditated murder. *Id.* Petitioner then filed his Motion for New Trial after his conviction (Docket No. 20-1, pages 83-86), but was denied relief by the trial court on April 14, 2010. *Id.* at 87. Petitioner filed his Notice of Appeal on May 7, 2010 to appeal his conviction to the Tennessee Court of Criminal Appeals. *Id.* at 88. The Tennessee Court of Criminal Appeals affirmed Petitioner's conviction on direct appeal in an opinion issued on August 12, 2011. *State v. Williamson*, 2011 WL 3557827, at *15; Docket No. 20-9. Petitioner then filed an application for permission to appeal to the Tennessee Supreme Court, but that application was denied on December 14, 2011. Docket No. 20-11; *State v. Williamson*, No. M2010-01067-SC-R11-CD (Tenn. Dec. 14, 2011).

After the direct appeal process had ended for Petitioner, he began seeking relief from his conviction by mounting collateral attacks[2] in state court. Petitioner first attempted to file a petition for post-conviction relief; however, his retained counsel "failed to file the petition within the statute of limitations." *Williamson v. State*, 476 S.W.3d 405, 409 (Tenn. Crim. App. 2015); Docket No. 20-20, page 3; *see* Docket No. 20-12, pages 1-26. Nonetheless, the trial court granted a subsequent motion requesting the tolling of the statute of limitations to file for relief. *Id.*; *see* Docket No. 20-12, pages 27-38, 42-46. Following the post-conviction hearing on December 10, 2013, the trial court denied Petitioner's request for post-conviction relief. *Id.* at 417; *see* Docket No. 20-12, page 59. Petitioner then filed a Notice of Appeal on January 27, 2014, appealing the denial of his post-conviction relief petition to the Tennessee Court of Criminal Appeals. Docket No. 20-12, page 60. The Tennessee Court of Criminal Appeals affirmed the trial court's denial of post-conviction relief on April 14, 2015. *Williamson v. State*, 476 S.W.3d at 428. The Tennessee Supreme Court denied Petitioner's application for permission to appeal on June 21, 2015. Docket No. 20-22; *Williamson v. State*, No. M2014-00183-SC-R11-PC (Tenn. June 21, 2015).

Now pending is Petitioner's Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody filed on March 12, 2013. Docket No. 1. Petitioner also filed a Motion to Stay Proceedings Pending Exhaustion of Petitioner's Unexhausted Claims on March 12, 2013. Docket No. 2. Petitioner's motion was granted on June 11, 2013. Docket No. 6. The case was held in abeyance until June 29, 2015, when Petitioner filed his Amendment to Petition.

---

[2] A collateral attack is "[a]n attack on a judgment in a proceeding other than a direct appeal; esp., an attempt to undermine a judgment through a judicial proceeding in which the ground of the proceeding (or a defense in the proceeding) is that the judgment is ineffective." COLLATERAL ATTACK, Black's Law Dictionary (11th ed. 2019).

5

Docket No. 7.  On August 31, 2015, Petitioner filed his Motion to Reopen and Notice that Petitioner is Ready to Resume Proceedings, which was granted on October 7, 2015.  Docket Nos. 11, 12.  Respondent filed his Answer to Amended Petition for Writ of Habeas Corpus on January 13, 2016.  Docket No. 21.  Petitioner filed his Reply to State's Answer on March 22, 2016. Docket No. 31.

The next section in this Report and Recommendation explains the legal standard Petitioner's request for habeas corpus relief will be reviewed under.

## II. Standard of Review

State prisoners may petition to the federal courts for relief of their state convictions by application of a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

### 1. Exhaustion Requirement

To be granted relief from a state conviction, it must appear that: "the applicant has exhausted the remedies available in the courts of the State;" "there is an absence of available State corrective process;" or "circumstances exist that render such process ineffective to protect the rights of the applicant."  *Id.* § 2254(b)(1)(A)-(B).  The exhaustion requirement ensures state courts have "an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  To meet the requirement, the state prisoner seeking relief must raise the claims in the available state courts,[3] *Rose v. Lundy*, 455 U.S. 509, 520 (1982), and must present those claims "to the state courts under the same theory in which it is later presented in federal court."  *Wong v. Money*, 142 F.3d

---

[3] For claims arising from state criminal proceedings in Tennessee, the exhaustion requirement is met when the Tennessee Court of Criminal Appeals has reviewed the asserted claims of error on the merits.  *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003).

6

313, 322 (6th Cir. 1998) (citing *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987); *Prather v. Rees*, 822 F.2d 1418, 1421 (6th Cir. 1987)). Though, "when [a] prisoner fails to fully and fairly present his claims to the state courts before the time for him to do so has expired, he procedurally defaults and is foreclosed from federal habeas corpus review of those claims, absent a showing of cause and prejudice or a fundamental miscarriage of justice." *In re Cook*, 215 F.3d 606, 608 (6th Cir. 2000) (citing *O'Sullivan*, 526 U.S. 838 (1999); *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 90-91 (1977)).

### 2. **Standard of Review for Fully Exhausted Claims**

Habeas corpus relief shall not be granted to a state prisoner seeking an application for a writ on fully exhausted claims, except in two circumstances. *See* 28 U.S.C. § 2254(d)(1)-(2). The first circumstance is when "the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Id.* § 2254(d)(1). "A state court's adjudication of a claim is 'contrary to' clearly established federal law 'if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts.'" *Stojetz v. Ishee*, 892 F.3d 175, 192 (6th Cir. 2018), *cert. denied sub nom. Stojetz v. Shoop*, 139 S. Ct. 1262 (2019) (quoting *Van Tran v. Colson*, 764 F.3d 594, 604 (6th Cir. 2014)). Also, "a state court's decision involves an 'unreasonable application' of federal law when 'the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case.'" *Id.* (quoting *Henley v. Bell*, 487 F.3d 379, 384 (6th Cir. 2007)). "'[C]learly established federal law' includes only the holdings of the Supreme Court, excluding any dicta; and an application of these holdings is

7

'unreasonable' only if the petitioner shows that the state court's ruling 'was so lacking in justification that there was error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* (quoting *White v. Woodall,* 572 U.S. 415, 427 (2014)).

The second circumstance in which habeas corpus relief may be granted is when the state's adjudication of a petitioner's claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Further, absent a showing by clear and convincing evidence otherwise by a petitioner, determinations of fact "made by a State court shall be presumed to be correct." *Id.* § 2254(e)(1). To obtain relief under § 2254(d)(2), "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011) (quoting 28 U.S.C. § 2254(d)(2)).

### III. Law and Analysis[4]

Petitioner asserts multiple claims of error, arguing that his Sixth and Fourteenth Amendment rights to the United States Constitution have been violated. Specifically, Petitioner argues that: (1) his rights to present a defense and to a jury trial under the Sixth and Fourteenth Amendments to the United States Constitution were violated by "the refusal of the trial court to give a self-defense instruction" (Docket No. 1, page 6; *see* Docket No. 7, page 3; *see also* Docket No. 31, pages 29-31); (2) he "was denied his right to present a defense under the Sixth and

---

[4] In his Reply, Petitioner concedes that "not all of Petitioner's original claims were well pleaded and not all of the original claims were ultimately exhausted;" (Docket No. 31, page 4) accordingly, the undersigned will review the claims Petitioner maintains in his Reply as those asserted as grounds for habeas corpus relief.

8

Fourteenth Amendment [*sic*] to the United States Constitution by the decisions of the Criminal Court for Sumner County and the Court of Criminal Appeals that the testimony of Stephen Montgomery, M.D., was not admissible on the issue of whether [Petitioner] lacked the capacity to premeditate and reflect at the time of the offense" (Docket No. 7, page 6; *see* Docket No. 31, pages 31-59); and (3) that he received ineffective assistance of counsel in violation of his Sixth and Fourteenth Amendment rights. Docket No. 1, page 7; *see* Docket No. 7, page 4; *see also* Docket No. 31, pages 59-65.

## 1. <u>Trial Court's Refusal to Instruct the Jury on Self-Defense</u>

### a. Exhaustion

Petitioner raised this claim in his Motion for New Trial at the trial court, (*see* Docket No. 20-1, pages 83-84), and appealed the denial of his claim from the trial court to the Tennessee Court of Criminal Appeals. Docket No. 20-7, pages 65-70. The Tennessee Court of Criminal Appeals reviewed his claim on the merits;[5] therefore, Petitioner has fully exhausted this claim in the available state proceedings. *See State v. Williamson*, 2011 WL 3557827, at *13-14

### b. Merits

Petitioner first claims that his right to present a defense and to a jury trial under the Sixth and Fourteenth Amendments to the United States Constitution were violated "by the refusal of the trial court to give a self-defense instruction." Docket No. 1, page 6; *see* Docket No. 7, page 3; *see also* Docket No. 31, pages 29-31. Petitioner supports this claim in his Reply by citing multiple statements from his trial testimony, including: his "inten[tion] to drive by the victim's

---

[5] In his brief to the Tennessee Court of Criminal Appeals on direct appeal, Petitioner requested plain error review based on an alleged failure to raise the argument with the trial court in writing; (Docket No. 20-7, page 67) however, the Tennessee Court of Criminal Appeals addressed the arguments on the merits without plain error review. Accordingly, the claim was fully exhausted within the requirements of 28 U.S.C. § 2254(b)(1).

home so the victim would know he came by" (Docket No. 31, page 29); his belief that "the victim would be in the house putting his young son to bed" (*Id.* at 30); being "confronted by two people in the road" (*Id.*) and "the victim coming toward him and raising his arms" (*Id.* (citing Docket No. 20-5 at 26, 69-72)); being "panicked" and "just fir[ing]" (*Id.* (citing Docket No. 20-5 at 75-77)); the victim's threats made toward Petitioner (*Id.* (citing Docket No. 20-5 at 41-42, 44, 48-51)); his attempted avoidance of the victim in public (*Id.* (citing Docket No. 20-5 at 43-46)); and evidence of the victim's "looking forward" to Petitioner's "arrival." *Id.* (citing Docket No. 20-4 at 66-67, 79-80). Petitioner further contends in his Reply "that the state courts simply chose to ignore the evidence in favor of a self-defense instruction" (*Id.*), and "[u]nder these circumstances, this Court should review the denial of a self-defense instruction." *Id.* at 31.

Respondent contends that "the Tennessee Court of Criminal Appeals' rejection of this claim was not contrary to, or based on an unreasonable application of clearly established federal law," "[n]or was it based on an unreasonable determination of the facts in light of the evidence." Docket No. 21, page 23 (citing 28 U.S.C. § 2254(d)). Respondent asserts that, although the Tennessee Court of Criminal Appeals did not cite to federal case law in deciding that Petitioner was not entitled to relief, "it correctly applied the rules discussed therein." *Id.* at 25. Respondent further asserts that "the evidence simply did not support a self-defense instruction, and the habeas pleading do not identify any evidence undermining the state courts conclusion in this regard." *Id.* Accordingly, Respondent concludes, Petitioner's "claim is without merit and must be denied." *Id.* at 23.

"'Whether rooted directly in the Due Process Clause[s] . . . or in the Compulsory Process or Confrontation Clause of the Sixth Amendment, the [United States] Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.'" *United States v.*

10

*Blackwell*, 459 F.3d 739, 752 (6th Cir. 2006) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 319 (2006)); *see also California v. Trombetta*, 467 U.S. 479, 485 (1984). However, "[b]ecause 'federal habeas corpus relief does not lie for errors of state law,'" federal courts "may grant the writ based on errors in state jury instructions only in extraordinary cases." *Daniels v. Lafler*, 501 F.3d 735, 741 (6th Cir. 2007) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). In fact, "[s]tate-law trial errors will not warrant habeas relief unless the 'error rises to the level of depriving the defendant of fundamental fairness in the trial process.'" *Hutchison v. Bell*, 303 F.3d 720, 731 (6th Cir. 2002) (quoting *Serra v. Michigan Dep't of Corr.*, 4 F.3d 1348, 1354 (6th Cir. 1993)); *see Cupp v. Naughten*, 414 U.S. 141, 147 (1973) (explaining that errors in state jury instructions are not grounds for habeas relief unless "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.").

As an initial matter, Petitioner does not cite to nor can the undersigned identify the clearly established federal law that would provide grounds for habeas corpus relief in his case. Instead, Petitioner and Respondent rely on a Sixth Circuit Court of Appeals opinion in *Taylor v. Withrow*, 288 F.3d 846, 851 (6th Cir. 2002), that interpreted a Supreme Court opinion in *obiter dictum*.[6] Although the undersigned acknowledges that reliance on such interpretation cannot be grounds for relief pursuant to 28 U.S.C. § 2254(d)(1) because it is not "clearly established" precedent from the Supreme Court, Petitioner, nonetheless, would not be entitled to relief under such standard.

---

[6] *Obiter dictum* refers to "observations relevant, but not essential, to the determination of the legal questions then before the court." *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, 459 (1st Cir. 1992). "Dictum constitutes neither the law of the case nor the stuff of binding precedent." *Id.* (citing *Great Lakes Dredge & Dock Co. v. Tanker Robert Watt Miller*, 957 F.2d 1575, 1578 (11th Cir. 1992); *Milgard Tempering, Inc. v. Selas Corp.*, 902 F.2d 703, 715–16 (9th Cir. 1990)).

11

In *Taylor v. Withrow*, the Sixth Circuit Court of Appeals held that the "right of a defendant in a criminal trial to assert self-defense is [a] fundamental right[], and that failure to instruct a jury on self-defense when the instruction has been requested and there is sufficient evidence to support such a charge violates a criminal defendant's rights under the due process clause. 288 F.3d 846, 851 (6th Cir. 2002). The holding in *Taylor* was based, in part, on the Supreme Court's explanation in *Mathews v. United States*, 485 U.S. 58 (1998) that "'a defendant [in a federal trial] is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor,' including the defense of self-defense." *Taylor*, 288 F.3d at 852 (quoting *Mathews*, 485 U.S. at 63-64). Though, as noted by the Sixth Circuit in a later opinion, the *Taylor* Court's interpretation of *Mathews* was dictum. *Newton v. Million*, 349 F.3d 873, 878 (6th Cir. 2003) (abrogated on other grounds) (quoting *Taylor*, 288 F.3d at 852). In fact, another opinion from the Sixth Circuit affirms that the constitutional grounds for habeas relief based on a state's refusal to instruct on self-defense are unclear. *See Phillips v. Million*, 374 F.3d 395, 397 (6th Cir. 2004) ("[o]ur review of the Supreme Court case law finds only one Supreme Court opinion discussing the denial of a self-defense instruction and due process, and that was mentioned as a hypothetical in a *dissent*." (citing *Gilmore v. Taylor*, 508 U.S. 333, 359 (1993) (Blackmun, J., dissenting)). Despite the apparent lack of clearly established federal law on this issue, the undersigned will review Petitioner's argument based on the rule explained in *Taylor* because both Parties rely on its principle in their pleadings.

The trial court and Tennessee Court of Criminal Appeals considered the facts underlying Petitioner's case as stated above. *See State v. Williamson*, 2011 WL 3557827, at *1-3. In

12

Petitioner's Motion for New Trial in the state trial court in which he was convicted, the court

addressed Petitioner's argument as follows:

> As to Ground 3, I erred in failing to instruct the jury on self-defense, like General
> Blanton stated - - and I've gone back over this record extensively and my notes
> extensively - - there's nothing in the facts to warrant a self-defense instruction.
> To the contrary, the defendant was the one that drove over there, took a loaded
> gun to a neighborhood. And although there was bad blood, although there was a
> phone conversation that made the defendant upset, that does not rise to the level
> of self-defense, and that particular issue is not merited as well.

Docket No. 20-2, pages 23:18-25 – 24:1-4. On appeal from the trial court's denial of relief, the

Tennessee Court of Criminal Appeals addressed Petitioner's argument that he was entitled to a

jury instruction on self-defense:

> **VII. Denial of Request for Self-Defense Jury Instruction**
> The Defendant argues that the trial court erred in denying his request for a jury
> instruction on self-defense based on his testimony that he panicked when he saw
> the victim approach his car with his hands up. The trial court, however,
> determined that the Defendant's actions of taking a loaded weapon to a
> confrontation he initiated did not entitle him to self-defense instruction. We agree.
>
> The defense of self-defense is expressly provided for in Tennessee by statute and
> is defined, in relevant part, as follows:
>
>> (a) A person is justified in threatening or using force against
>> another person when and to the degree the person reasonably
>> believes the force is immediately necessary to protect against the
>> other's use or attempted use of unlawful force. The person must
>> have a reasonable belief that there is an imminent danger of death
>> or serious bodily injury. The danger creating the belief of
>> imminent death or serious bodily injury must be real, or honestly
>> believed to be real at the time, and must be founded upon
>> reasonable grounds. There is no duty to retreat before a person
>> threatens or uses force.
>
> Tenn.Code Ann. § 39–11–611(a).
>
> A trial court has the duty to "give a complete charge of the law applicable to the
> facts of the case." *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn.1986). This duty
> includes "giving jury instructions concerning fundamental issues to the defense
> and essential to a fair trial...." *State v. Anderson*, 958 S.W.2d 9, 17
> (Tenn.Crim.App.1998). *See also Myers v. State*, 185 Tenn. 264, 206 S.W.2d 30,

13

32 (Tenn.1947) (holding that a defendant is entitled to an affirmative instruction on self-defense if raised by the evidence). In deciding whether a defense instruction is warranted, the trial court "must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." *State v. Sims*, 45 S.W.3d 1, 9 (Tenn.2001).

Though the question of whether an individual acted in self-defense is a factual determination to be made by the jury, *see State v. Ivy*, 868 S.W.2d 724, 727 (Tenn.Crim.App.1993), our law also mandates that "[t]he issue of the existence of a defense is not submitted to the jury unless it is fairly raised by the proof ." Tenn.Code Ann. § 39–11–203(c). Additionally, this Court is instructed to interpret the above statute to require that "[t]he defendant has the burden of introducing admissible evidence that a defense is applicable." *Id.*, Sentencing Commission Comments; *see also State v. Leaphart*, 673 S.W.2d 870, 873 (Tenn.Crim.App.1983) (holding "[a]lthough it is well-settled that an accused is entitled to an affirmative instruction on every issue fairly raised by the evidence, there is no requirement that the court charge on matters not raised by the proof"). Thus, this Court may find error only if a jury charge "fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Phipps*, 883 S.W.2d 138, 142 (Tenn.Crim.App.1994).

Even considering the evidence in the light most favorable to the Defendant, we agree with the trial court that the evidence contained in the record does not raise a factual issue of self-defense. Though the Defendant testified that he was afraid of the victim based on months of harassing text mail and voice mail messages, the victim never physically harmed the Defendant or even attempted to. On the evening of the shooting, the Defendant decided that he had had enough of the victim's haranguing and drove thirteen miles to the victim's home, with a loaded semi-automatic weapon. Upon seeing the victim approach his car, with his hands raised in the air and bearing no weapon, the Defendant said he "panicked" and unloaded the entire magazine of twelve bullets plus the one bullet in the chamber in the direction of the victim. Seven shots penetrated the victim's left back, rear shoulder and arm area. Nothing in the record suggests that the Defendant acted to protect himself against the victim's use or attempted use of unlawful force. Accordingly, we conclude the trial court's refusal to instruct the jury on self-defense was not error.

*State v. Williamson*, 2011 WL 3557827, at *13-14.

In the present matter, Petitioner has not shown that the state courts' finding that he was not entitled to instruct the jury on self-defense contradicted or unreasonably applied clearly established federal law. As shown above, the trial court found Petitioner's evidence to "not rise

14

to the level of self-defense." Docket No. 20-2, page 24:2-3. Also, the Tennessee Court of

Criminal Appeals noted that "'[t]he issue of the existence of a defense [in Tennessee] is not

submitted to the jury unless it is fairly raised by the proof.'" *Id.* at *14 (quoting Tenn. Code

Ann. § 39–11–203(c)). The appellate court observed that Petitioner testified the victim harassed

Petitioner for months through digital communications, but it found that the victim had not

actually harmed or threatened to harm Petitioner. *Id.* The appellate court found that Petitioner

drove to the victim's home with a loaded handgun, "'panicked'" as the victim approached

Petitioner's vehicle, and proceeded to discharge thirteen rounds at the victim, striking him seven

times. *Id.* As the state courts found the evidence insufficient for a jury to find that Petitioner had

acted in self-defense, neither court granted relief to Petitioner on that ground. *Id*; *see* Docket No.

20-2, pages 23:18-25 – 24:1-4. Although neither court cited to federal law in its analysis, the

courts' conclusions that Petitioner had not presented enough evidence to necessitate the self-

defense instruction does not contradict or unreasonably apply the purported federal standard that

would require a state to allow a defendant to instruct the jury when raising "sufficient" evidence.

*See Taylor*, 288 F.3d at 852 (quoting *Mathews*, 485 U.S. at 63-64). Having observed the state

courts' conclusions that Petitioner did not present enough evidence to be granted a self-defense

instruction, the undersigned finds that the state courts' decision to deny Petitioner's request to

raise that instruction did not "so infect[] the entire trial that the resulting conviction violates due

process." *See Cupp*, 414 U.S. at 147. Accordingly, the undersigned finds that Petitioner's claim

does not meet the standard in 28 U.S.C. § 2254(d)(1). Therefore, Petitioner is not entitled to

habeas corpus relief on this claim.

       Additionally, Petitioner has not shown that the state courts unreasonably interpreted the

facts they used to make their decisions. Petitioner cites to evidence the trial and appellate courts

could have found persuasive to his claim; however, the state courts found evidence that would support their conclusion that Petitioner was not entitled to a self-defense instruction. Critical to each of the court's conclusions was that Petitioner drove to the victim's home with a loaded handgun, observed the victim with his arms raised in the air, and discharged all thirteen rounds of ammunition at the victim. *See State v. Williamson*, 2011 WL 3557827, at *13-14; *see also* Docket No. 20-2, pages 23:18-25 – 24:1-4. Additionally, the Tennessee Court of Criminal Appeals acknowledged several facts that minimally support Petitioner's claim, but found that "the victim never physically harmed [Petitioner] or even attempted to," and the Court ultimately concluded that "[n]othing in the record suggests that [Petitioner] acted to protect himself against the victim's use or attempted use of unlawful force." *Id.* at *14. Having reviewed the state courts determination of the facts used to support their conclusions that Petitioner was not entitled to a jury instruction on self-defense, the undersigned finds that Petitioner has not shown that the state courts unreasonably determined those facts. Petitioner has not defeated the presumption of correctness of the state courts' factual findings by showing clear and convincing evidence that they were unreasonably made. Therefore, the undersigned finds that Petitioner's claim on this ground does not meet the standard set forth in 28 U.S.C. 2254(d)(2) for establishing an entitlement to habeas corpus relief.

Having reviewed the entire record in the present case, the undersigned finds that Petitioner did not meet his burden of establishing that the state courts' decision on this ground was "contrary to, or involved an unreasonable application of, clearly established Federal law," nor did he show that the decision "was based on an unreasonable determination of the facts in light of the evidence presented in State court proceeding." *See* § 2254(d)(1)-(2). Thus, Petitioner is not entitled to relief on this ground.

**2.  Failure to Admit the Testimony of Stephen Montgomery, M.D.**

    **a.  Exhaustion**

Petitioner raised this claim in post-conviction proceedings, *see* Docket No. 20-13, page 210, and on appeal from the denial of post-conviction relief.  Docket No. 20-17, pages 61-76. The Tennessee Court of Criminal Appeals reviewed Petitioner's argument on the merits.  *See Williamson v. State*, 476 S.W.3d at 423.  Petitioner, therefore, has fully exhausted this claim in state proceedings.

    **b.  Merits**

Petitioner next argues that he "was denied his right to present a defense under the Sixth and Fourteenth Amendment [*sic*] to the United States Constitution by the decisions of the Criminal Court for Sumner County and the Court of Criminal Appeals that the testimony of Stephen Montgomery, M.D., was not admissible on the issue of whether [Petitioner] lacked the capacity to premeditate and reflect at the time of the offense."  Docket No. 7, page 6; *see* Docket No. 31, pages 31-59.  Petitioner specifies in his Reply that: (1) the "exclusion of Dr. Montgomery's [t]estimony 'infringed upon a weighty interest' of [Petitioner]" and was "'arbitrary' or 'disproportionate to the purposes [the rules] are designed to serve;'" (Docket No. 31, page 38) and (2) the conclusions "were also incorrect because [they] were based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *Id.* at 45 (citing 28 U.S.C. § 2254(d)(2)); *see also Id.* at 57.

In support of his first argument, Petitioner states in his Reply that the rule of law established in *State v. Hall*, 958 S.W.2d 679, and utilized by the Tennessee Court of Criminal Appeals in denying relief has since been criticized.  Docket No. 31, page 45; *Id.* at 51.  Petitioner contends that the Tennessee Court of Criminal Appeals "has now questioned the reasonableness

of its line of decisions explaining *Hall*" and has "questioned the logic of its narrow interpretations of the *Hall* doctrine." *Id.*; *Id.* at 51. Further, Petitioner contends "[a]dditional indicia that the rule from *Hall* as applied to Mr. Williamson is "'arbitrary' [*sic*] or 'disproportionate to the purposes it is intended to serve' is demonstrated by the dramatically different rules as applied to the insanity defense and the defense of challenging the existence of *mens rea*." *Id.* at 51. Petitioner continues that "[t]he appeals court's attempt to distinguish [*State v. Vaughn*, 279 S.W.3d 584 (Tenn. Crim. App. 2008)] from [Petitioner] at best creates a distinction without a difference." Docket No. 31, page 52. Finally, Petitioner asserts that the Tennessee Court of Criminal Appeals did not sufficiently distinguish between the "appropriate instruction in *Hall* type cases" and "the role of the court in determining admissibility" (*Id.* at 54-55) and "does not address the meaning of 'which affected his or her capacity' that was the crux of Petitioner's argument." *Id.* at 55. In his conclusion, Petitioner asserts "[t]his restrictive application of *Hall* as used in *Williamson* is 'arbitrary' or 'disproportionate to the purposes it is intended to serve.'" *Id.*

In support of his second argument, Petitioner contends that the Court of Criminal Appeals focused on Dr. Montgomery's testimony that "'it is <u>possible</u> that due to [Petitioner's] PTSD …, that he misperceived environmental signs of dangers and reacted in an impulsive and protective manner.'" *Id.* at 45 (citing Docket No. 20-20 at 11, 17-18). Petitioner further states that "[h]owever, Dr. Montgomery's testimony, both as reported in the transcript and in the post-conviction testimony section of the Court of Criminal Appeals decision, was clear that by 'possible' he meant 'more likely than not.'" *Id.* (citing Docket No. 20-13 at 186-187); Docket No. 20-20 at 9. The effect of this interpretation of the facts, Petitioner concludes, "reduces Dr. Montgomery's conclusion as to the likelihood that [Petitioner] was unable to form the requisite

18

*mens rea* from being very likely, 'more likely than not' to a mere speculation." *Id.* Accordingly, Petitioner reasons, "[t]o the extent that state court's opinion [*sic*] converts Dr. Montgomery's testimony from admissible medical expert testimony helpful to the decision of the jury to mere inadmissible speculation, ignoring the facts of the actual testimony creates an 'unreasonable determination of the facts.'" *Id.* (quoting *Wiggins v. Smith*, 539 U.S. 510, 528 (2003)). Petitioner further states that the trial and appellate courts "confuse[d] Dr. Montgomery's methodology for diagnosing mental illness" and "ignores Dr. Montgomery's actual testimony that PTSD is a mental disease, that the disease was present at the time of the crime, and therefore, it was more likely than not that Williamson was unable to form the requisite intent for first-degree murder." *Id.* at 59 (citing Docket No. 20-13 at 175-177, 186-187).

Respondent contends that the Tennessee Court of Criminal Appeals "reasonably concluded that the defendant's proffered mental health evidence would not have satisfied the state-law requirements for admissibility" (Docket No. 21, page 47 (citing *Williamson*, 2015 Tenn. Crim. App. LEXIS 267, at *37-47)) and "reasonably concluded that the admission of [Dr. Montgomery's testimony] was not required to protect the defendant's right to present a defense." *Id.* (citing *Williamson*, 2015 Tenn. Crim. App. LEXIS 267, at *47-49). In support of this contention, Respondent cites to the Sixth Circuit opinions in *Wong v. Money*, 142 F.3d at 324 and *Sanford v. Yukins*, 288 F.3d 855, 862 (6th Cir. 2002), stating that the "Tennessee Court of Criminal Appeals explicitly held that the precluded evidence was inadmissible as a matter of Tennessee law, and that determination is not subject to review here." *Id.* at 48. Further, Respondent states "[t]he petitioner had the opportunity to testify in his own defense regarding his mental state at the time he shot the victim." *Id.* at 49. Respondent also cites *Clark v. Arizona*, 548 U.S. 735 (2006) for the proposition that "states may preclude a diminished-capacity

19

defense." *Id*. Accordingly, Respondent contends, "*Clark* leaves little doubt that Tennessee's decision to limit the type of evidence to support a diminished capacity defense does not offend the Due Process Clause or the defendant's right to present a defense." *Id*.

In his reply, Petitioner contends that his case presents a different issue than that addressed by the courts in *Wong*, *Sanford*, and *Clark*. Docket No. 31, page 36. First, Petitioner states as support that Respondent "overstates the *Wong* holding," and that "the clear and only holding of the case is that Ohio does not recognize a defense of diminished capacity, and further that Ohio law does not permit testimony for the purposes of negating the element of specific intent other than for an insanity defense." *Id*. at 33-34. Further, "[s]ince Tennessee law clearly permits expert testimony to negate *mens rea*, *Wong* is neither on point nor analogous." *Id*. at 33-34 (internal citation omitted). Secondly, Petitioner contends that "[t]he Respondent's reliance on *Sanford* . . . is equally unpersuasive." *Id*. at 34. Unlike the issue raised in *Sanford* relating to a challenge to state substantive law, Petitioner argues, he "does not challenge the elements of first degree murder as defined under Tennessee law, rather he challenges the arbitrary and unreasonable application of the rule for presenting expert testimony on the issue of *mens rea*." *Id*. Lastly, Petitioner asserts that "Respondent's reliance on *Clark* . . . again mistakes the application of the rule regarding the sanctity of a state substantive law versus that of a state procedural rule." *Id*. Rather, "*Clark* involves a question of whether a state has the freedom to restrict the use of expert testimony regarding mental health to only the affirmative defense of insanity." *Id*. Unlike the state laws at issue in the formerly cited cases, Petitioner contends, "Tennessee . . . clearly permits the use of expert testimony to negate the necessary intent to commit the offense." *Id*. at 37.

As stated previously, a criminal defendant has a constitutional right to present a defense. *Blackwell*, 459 F.3d at 752 (quoting *Holmes*, 547 U.S. at 319); *see also Trombetta*, 467 U.S. at 485. However, the right to present a defense has limits. *Loza v. Mitchell*, 766 F.3d 466, 481 (6th Cir. 2014) (quoting *Scheffer*, 523 U.S. at 308). "'State and federal rulemakers have broad latitude under the Constitution to establish rules of excluding evidence from criminal trials.'" *Id.* (quoting *Scheffer*, 523 U.S. at 308). Accordingly, "[a] defendant's right to present a complete defense is only violated 'by evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve.'" *Id.* (quoting *Holmes*, 547 U.S. at 324).

Turning to the facts relevant to Petitioner's claim, Dr. Montgomery testified on direct examination at Petitioner's post-conviction relief hearing that, "to a reasonable degree of medical certainty" Petitioner had post-traumatic stress disorder. Docket No. 20-13, page 177:7-11. The following exchange took place on cross examination:

> Q. All right. And did you tell the attorneys that Mr. Williamson didn't have the capacity to form the elements of premeditation or intent to commit first degree murder?
>
> A. I can't recall exactly what I said. I didn't take notes about it, but we did discuss the issue of diminished capacity. I told them I thought it did - - I would have some information that might be helpful to them with the trial regarding that issue.
>
> Q. But you didn't tell them that he lacked the capacity to commit first degree murder, namely premeditation and intent, did you?
>
> A. Again, I don't recall the specifics of what we discussed. I just told them I thought there is some evidence of a mental disorder; it might be relevant to diminished capacity.
>
> Q. That's as far as it went?
>
> A. We didn't talk very long. It was only a six-minute or less phone call. I think two six-minute or less phone calls.

21

Q. Well, as a matter of fact, even in your report that's here before the Court today as an exhibit, you have not stated that he lacked the capacity to commit the elements of the crime that he's charged with. You haven't stated that, even in your report, have you?

A. I did not give that ultimate opinion, no.

Q. You said it was possible?

A. I thought - - yes. There was, I guess, specialized psychiatric information that was relevant to anyone making such a determination.

Q. And your language - - I'm not going to be hostile to you and I'm not trying to be that way at all, but in your language in your last paragraph is that it is possible that due to Mr. Williamson's untreated PTSD condition and the intensity of the emotional circumstances, that he misperceived environmental signs of danger and reacted in an impulsive and protected manner. Those are your words; right?

A. Those are my words; although, I think it would - - again. I'm not sure how to translate my words into legal words. Sometimes, in the legal realm, anything is possible. So I think I was meaning it was perhaps more likely than not, but I was not comfortable saying with a reasonable degree of medical certainty that it was my opinion that he lacked the capacity.

Q. And you buttress that in your next sentence: "in such a state it is possible that he lacked the capacity to exercise reflection and judgment prior to shooting the victim." So that's consistent with what you just testified to; is that correct?

A. I think so, yes.

Docket No. 20-13, pages 185:9-25 – 187:14. The trial court then conducted the following

questioning of Dr. Montgomery:

Q. Let me ask you this: Was he unable or did he lack the capacity to form the requisite culpable mental state for first degree murder?

A. I can't say that he was or was not.

Q. Do you know what the elements of first degree murder are?

A. Yes.

Q. Okay. So you cannot say that he was unable to lack the capacity or that he was unable to form the requisite culpable mental state for first degree murder?

22

A. No. All I can say is there were several factors that affected that.

Docket No. 20-13, pages 207:15-25 – 208:1-2. Having heard the testimony in the case, the post-conviction court found Dr. Montgomery's testimony to be admissible under Tennessee Rule of Evidence 702 (Docket No. 20-15, page 29:13-17), but the court also found Dr. Montgomery's testimony inadmissible under Tennessee Rules of Evidence 401 ("Definition of 'Relevant Evidence'") and 403 ("Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time"). *See* Docket No. 20-15, page 34. Additionally, the trial court found Dr. Montgomery's testimony to be lacking in credibility. Docket No. 20-15, page 35:3-9. Having made those findings, the trial court found the evidence "not admissible to mitigate the elements of the offense." Docket No. 20-15, page 37:3-4.

On appeal from the denial of Petitioner's post-conviction relief, the Tennessee Court of Criminal Appeals found the following facts relevant to its review of the post-conviction court's denial of Petitioner's petition for relief:

> At the post-conviction hearing, the evidence showed that the Petitioner's mother contacted counsel on the night of the crime. Counsel was present when the Petitioner surrendered to the authorities, and the Petitioner's mother retained counsel to represent the Petitioner. Within a short period of time, she also retained co-counsel. Both counsel and co-counsel testified that they never discussed who would be lead counsel and that they divided the duties, with counsel obtaining technical support to retrieve text messages from a cell phone and co-counsel hiring a private investigator and a mental health expert. Counsel and a third attorney represented the Petitioner in the appeal, with the third attorney taking primary responsibility for preparing the brief.
>
> Regarding the day of the crime, the post-conviction evidence showed that the Petitioner worked until mid-afternoon for his stepfather, John Michael McKinnon. After work, the Petitioner, Mr. McKinnon, and a co-worker drank two twelve-packs of beer on their way to Mr. McKinnon's house, where they continued drinking. At some point, the Petitioner went to the apartment he shared with Ms. Holmes. When asked about the Petitioner's sobriety when he left, Mr. McKinnon testified that the Petitioner seemed "fine."

23

Roger Williamson, the Petitioner's father, testified about an incident before the crime in which the victim followed the Petitioner home and "cut a tailspin" in the driveway. He encouraged the Petitioner to file a complaint with the sheriff's department. He said that while they waited for the sheriff's department to arrive, the Petitioner let him listen to recordings on the Petitioner's cell phone of "threats and stuff" from the victim. He said he was concerned for the Petitioner's safety.

Mr. Williamson testified that he paid part of the attorney's fees for the trial and that he paid the fees for the appeal. He said co-counsel asked him shortly before the trial to pay the fees for a mental health expert, and he agreed. He said he asked counsel immediately after the crime if the Petitioner should see a doctor. He said that he would have paid for additional investigation or experts if he had been asked and that he was paying for the post-conviction case. He said counsel and co-counsel never talked to him about the Petitioner's childhood or any issues the Petitioner might have had. He said he would have testified if he had been asked.

John Michael McKinnon testified that he was living with the Petitioner's mother, Maria Creasy, at the time of the crime. He said that neither counsel, co-counsel, nor their representatives contacted him about the Petitioner's actions on the day of the crime. He said they never asked if the Petitioner had been drinking that day or inquired about the Petitioner's relationship with Ms. Holmes before that day. He said he would have talked to them if they had asked for information.

Maria Creasy, the Petitioner's mother, testified that before the crime, the Petitioner confided in her about his relationship with Ms. Holmes. She said the couple's problems escalated in May and June 2008. She was aware of the problems the Petitioner had with the victim. She said the Petitioner was fearful and frustrated because he did not understand what to do. She said the Petitioner typically carried a gun.

Ms. Creasy testified that the Petitioner started a new job on June 16, 2008, and that she was unable to reach him on June 17, which she understood was because he was in bed due to Ms. Holmes's "bickering at him all day." She said that on the morning of June 18, the Petitioner came to her house and said he wanted to work with Mr. McKinnon and that Mr. McKinnon agreed.

Ms. Creasy testified that the Petitioner, Mr. McKinnon, and another man came to the house after work. She said everyone was drinking. She said that Ms. Holmes kept calling and that the Petitioner was reluctant to leave but eventually went home. She said that after she learned of the shooting, she contacted the Petitioner. She also contacted counsel, who met her and the Petitioner at the sheriff's department. She said she hired both counsel and co-counsel to represent the Petitioner.

Ms. Creasy testified that co-counsel initially stated that his attorney's fee would be $25,000, which she paid. She said she requested an invoice and received one

dated July 2, 2008 that stated the amount did not include investigative fees or third-party expenses. She said co-counsel kept requesting more money, and she kept paying him. She said she paid him $15,000 on September 26 and $10,000 on October 22. She assumed co-counsel was paying the investigators from the $50,000 she had paid at this point. She said she received a December 3 invoice that stated she had paid a flat fee of $30,000. She paid an additional $5,000 on February 13, 2009, that co-counsel told her she still owed him. She said he stated she would be charged a fee if she did not pay the balance. She said she had to ask repeatedly to receive invoices reflecting her payments and was never given a retainer letter. She provided documentation of her payments, which were received as exhibits. She said that she was unable to get a clear answer about the money she paid co-counsel and that he was difficult to reach.

Ms. Creasy testified that co-counsel told her a civil case he filed against the victim's estate was part of his strategy for handling the criminal case and that he did not expect to prevail in the civil case. She said that he never told her there would be additional attorney's fees and expenses for the civil case and that he never asked for attorney's fees for a civil case the victim's estate filed against the Petitioner.

A private investigator testified that he had no difficulty obtaining Brandon Clark's personnel records from the Sumner County Sheriff's Department. The records, which related to off-duty conduct, were received as an exhibit.

Co-counsel testified that he charged the Petitioner's mother a $50,000 flat fee to represent the Petitioner. He did not remember the fee for the civil case. He did not know how the expenses for the investigator and the expert were billed.

Co-counsel testified that he filed a civil complaint alleging intentional infliction of emotional distress and assault on the Petitioner's behalf against the victim's estate. He said he filed the civil complaint to be "consistent" with the defense in the criminal case, but he denied the sole purpose of the civil litigation was to take depositions. He acknowledged the civil case provided more opportunity for discovery than the criminal case. He thought some of the depositions were taken but said he did not have any transcripts. He said that the deponents were the victim's neighbors and that he was interested in knowing whether the victim had a weapon. He said the deponents provided additional names of witnesses that were given to Chrystal Waltz, the private investigator. He acknowledged the date reflected in the deposition notices, which was about one month before the criminal trial.

Co-counsel testified that the victim's estate filed a lawsuit against the Petitioner and that he did not know if the second civil suit would have been filed if he had not filed the first one. He acknowledged that in the case filed by the estate, sanctions were requested for his and the Petitioner's failure to appear at a deposition.

Co-counsel testified that he worked with the investigator to obtain information and statements. He said he did a substantial amount of legal research on possible defenses and the effect of the victim's continuing threats. He said that he communicated consistently with counsel and that as the trial date approached, they spent more time on the case because an attorney must dedicate his or her entire practice to a case about to be tried. He acknowledged that cell phone records were subpoenaed on the Friday before the trial started the following Monday.

Co-counsel testified that the defense wanted to show that due to ongoing pressure and conflict with the victim, the Petitioner reacted because he perceived a real and present threat. He said they wanted to show that when the Petitioner arrived at the victim's home, he felt compelled to defend himself. He said that he and counsel did not obtain a mental health expert initially because they concluded from their own observation of the Petitioner and analysis of the case that diminished capacity was not an appropriate defense.

Regarding the decision to consult a mental health expert shortly before the trial, co-counsel testified that he hired Dr. Stephen Montgomery to evaluate the Petitioner. He did not recall what documents he provided Dr. Montgomery and said he spoke to him before and after the evaluation for more than five minutes. He did not recall Dr. Montgomery's diagnosis of the Petitioner but said the doctor's testimony would not have supported a diminished capacity defense. He said he and counsel filed a notice of intent to offer expert mental health testimony and thought the trial court ruled that it was untimely. Exhibits were received reflecting defense filings about a week before the trial began relative to mental health evidence. He thought the possibility of expert proof was not mentioned at the June 29 pretrial conference because the evaluation was scheduled for the following day. He said the delay in obtaining the evaluation was due to continually evolving trial strategy. He said that he thought calling a mental health expert would have been a risk and that successful cross-examination of a defense expert could show that the Petitioner was not "feeling as bad" as the defense tried to portray and could "gut" the defense. He did not think it was a "body blow" to the defense that Dr. Montgomery did not testify.

Co-counsel testified that to the best of his recollection, the discovery information indicated the Petitioner was angry and drinking before he left his apartment. He said that Mr. McKinnon was interviewed and that he was sure Mr. McKinnon was asked if Mr. McKinnon and the Petitioner drank after work. He said he and counsel never had any indication the Petitioner had been intoxicated. He said that he cross-examined Ms. Holmes about a text message stating that the Petitioner was intoxicated on the night of the crime and that she professed no recollection of having sent the message. He agreed that Brandon Clark and the Petitioner were friends and that Mr. Clark did not want to testify against the Petitioner. He said that after interviewing the Petitioner, he did not think alcohol use or intoxication

were issues and noted that the Petitioner was physically fit and "worked out" a lot.

Co-counsel testified that he met with post-conviction counsel and a private investigator but acknowledged he had not returned several telephone calls from post-conviction counsel. He recalled post-conviction counsel's providing a release signed by the Petitioner for co-counsel's file from the conviction proceedings, but he did not recall whether he ever provided it. He said that he had looked for it and that the file could have been lost in a move.

Counsel testified that he was retained first and that he was surprised when the Petitioner's family hired co-counsel shortly thereafter. He said he had the impression initially that they considered co-counsel to be lead counsel, although he thought their expectation changed over time. He said he hired a technical person to access the information from the Petitioner's cell phone, but he did not recall the person's attempting to record the Petitioner's voice messages. He said he relied on co-counsel to direct the private investigator's work, and he thought he talked to the investigator at some point. He said co-counsel handled the contact with the mental health expert and acknowledged that they should have involved a mental health expert sooner, although he said he did not know if it would have made a difference. Counsel said that in hindsight, he was the more experienced attorney and should have taken the responsibility to obtain an expert earlier. He said no reason existed for the delay in consulting an expert. Regarding a notice of intent to use a mental health expert he filed on July 9, 2009, he stated that he filed it as soon as he knew the defense might offer expert testimony. He acknowledged that the State objected to the notice and that the defense withdrew it on the first day of the trial. He said co-counsel told him Dr. Montgomery was not going to say anything helpful for the defense. He said he met with co-counsel at co-counsel's office a couple of times and at the courthouse. He did not recall co-counsel's coming to counsel's office but said co-counsel might have.

Counsel testified that he visited the Petitioner at the jail several times. He did not know how many times but said it might have been as many as twelve. He tried to obtain information from the Petitioner, and closer to the trial, he reviewed the Petitioner's potential testimony with him. He did not recall if the Petitioner wrote to him expressing concern about being ready for trial.

Counsel testified that Brandon Clark was an important witness because Mr. Clark said in a written statement that the Petitioner had stated the shooting was premeditated. He thought in retrospect that the defense should have obtained Mr. Clark's personnel records.

Counsel testified that the defense theory was that the Petitioner went to the victim's house to confront but not to kill him, but that when he saw others were present, the Petitioner panicked and fired the gun. The defense wanted to show that friction and stress existed between the Petitioner and the victim and that Ms.

27

Holmes "stirred it up." Counsel acknowledged that the defense knew from the discovery information that Ms. Holmes said the Petitioner was intoxicated when he left their apartment and that they did not do much investigation of the Petitioner's alcohol use on the day of the crime. He said, though, he did not notice signs of intoxication when he met the Petitioner at the sheriff's department on the night of the crime. He said that although he and co-counsel might have pressed the Petitioner more about an accurate account of his alcohol consumption on the night of the crime, basing a defense upon intoxication was difficult.

Counsel testified that he and co-counsel were familiar with the facts before the trial began. He said that they had investigative work done and that he talked to some of the witnesses. He said he sought and obtained a second preliminary hearing about a week before the trial after they discovered no recording of the first one existed. He said that at the time, he felt like he had everything he needed for the trial and that he did not have any "major surprises" at the trial.

Counsel testified that he orally requested a self-defense instruction at the trial but did not submit a written request. He said the trial court's practice was to instruct the jury on everything fairly raised by the evidence. The post-conviction court noted that the self-defense instruction issue had been raised in the appeal of the conviction.

Chrystal Waltz testified that she performed investigative services for the defense while employed with Inquisitor. She said that co-counsel controlled the scope of the investigation and that she never discussed the investigation with counsel. She interviewed the Petitioner once at the jail but was unable to have a private interview because she was not an attorney. She said they met in the visitation room. She told co-counsel she was unable to have a private visit but did not recall if she asked him to accompany her in order to facilitate a private visit. She said that generally, one interview was insufficient to have a full understanding of the client and the situation. She said she was unable to get as much information as she wanted from the Petitioner because their meeting was not private. She said the Petitioner mentioned drinking two or three beers on the night of the crime but did not mention an alcohol problem.

Ms. Waltz testified that after she took photographs and prepared memoranda, she did not continue the investigation because she was unable to contact co-counsel. The memoranda were received as exhibits and listed various dates in June 2008. Based upon Ms. Waltz's experience, she thought further investigation was warranted. She said she was not asked to gather information about the Petitioner's mental health, education, or any hospital records. She said obtaining personnel and disciplinary records of testifying law enforcement officers was fairly routine.

Dr. Stephen Montgomery, a forensic psychiatric expert, testified that he evaluated the Petitioner in 2009. He said he did not prepare a report at that time but kept his notes. He said that he subsequently received additional information from post-

conviction counsel about the Petitioner's social background, family, alcohol usage, threats from the victim, and details of the incident and that he prepared his report after receiving the additional information.

Dr. Montgomery testified that in his opinion, the Petitioner had post-traumatic stress disorder (PTSD) caused by the victim's ongoing threatening behavior, as well as substance use disorders involving alcohol, cannabis, and cocaine. He said he did not initially diagnose PTSD but reached the diagnosis after receiving the additional information. He noted the Petitioner's young age and stated that at the time of the crime, the then-twenty-four-year-old Petitioner's brain would not have been fully developed. He said the brain was fully developed around age twenty-six or later in males.

Dr. Montgomery acknowledged receiving information from post-conviction counsel that the Petitioner had more alcohol on the day of the crime than the one or two beers the Petitioner originally reported. He said that alcohol impaired judgment and impulse control, without regard to whether a person had PTSD, but that a person with both a substance use disorder and a mental disorder typically experienced a synergistic effect. He said people with PTSD commonly self-medicated to lessen the intensity of their emotions. He said that trauma had a cumulative effect and that in his opinion, the Petitioner's PTSD and alcohol consumption would have significantly impaired his ability to exercise reflection and judgment. In Dr. Montgomery's opinion, it was more likely than not that the Petitioner lacked the capacity to form the culpable mental state for the offense, but he was unable to state that this was his opinion to a reasonable degree of medical certainty. When asked by the post-conviction court if the Petitioner had a mental disease or defect, rather than a particular emotional state or mental condition, Dr. Montgomery affirmed that the Petitioner had a mental disease or defect.

Regarding his communication with the Petitioner's trial attorneys, Dr. Montgomery said he had two telephone conversations of less than six minutes' duration each. He said the only information he had when he met with the Petitioner had been from a brief telephone call from an attorney but did not recall what the attorney told him. He did not recall exactly what he said to the attorney after he interviewed the Petitioner, but he thought he told the attorney evidence existed of a mental disorder that might be relevant to diminished capacity. He said he was not comfortable stating that the Petitioner lacked the capacity to exercise reflection and judgment but that it was possible the Petitioner lacked this capacity.

Dr. Montgomery acknowledged that the Petitioner had been in jail for several months when they met. When asked if the Petitioner's PTSD was the result of the Petitioner's knowledge that he had killed a former friend, his arrest, and his incarceration, Dr. Montgomery said, "[A]nything is possible." He said the information he received from the Petitioner was inconsistent with PTSD resulting from those causes. He said it was difficult for a psychiatrist to say with certainty

that a person was unable to form the intent for first degree murder committed a year earlier. He said PTSD symptoms might include irritability, anger, impulsiveness, and an inability to stop, reflect, and reason. He said PTSD "very well could have" caused the Petitioner to have misconceptions about what was taking place on the night of the crime.

Dr. Montgomery's report, which was received as an exhibit, noted that the Petitioner stated in the psychiatric evaluation that he was on edge all the time due to the victim's harassment. The Petitioner told Dr. Montgomery that he scanned cars and parking lots, had dreams of being killed by the victim, had intrusive daytime thoughts about the victim, and avoided the victim's house. The Petitioner also stated that he was hesitant to go places he might see the victim, avoided mutual friends, checked from a distance for signs of the victim when approaching his apartment, was irritable, had some emotional numbness, and experienced decreased attachment to his girlfriend.

Dr. Montgomery's report noted that in October 2007, the Petitioner saw the victim at a bank and that the victim communicated to the Petitioner through Ms. Holmes that he had been there to kill the Petitioner. The Petitioner told Dr. Montgomery that in October or November 2007, the victim, while driving a large truck, tried to run him off the road and had followed him home and driven "donuts" in the driveway. The Petitioner told the doctor that the victim yelled and screamed at him when the Petitioner and Ms. Holmes were at the victim's house to pick up the child. The Petitioner recounted an incident in which the victim beat on the Petitioner's car windows and threatened to kill him, which was similar to a childhood incident in which the Petitioner's father beat on the Petitioner's mother's car windows when his mother decided to leave home with the Petitioner and another child.

Pertinent to his conclusions, Dr. Montgomery stated the following in his report:

> Mr. Williamson described developing a constellation of psychiatric symptoms consistent with the symptoms of posttraumatic stress disorder (PTSD) as a result of the threatening statements and behaviors of the victim. Mr. Williamson was not being treated for PTSD at the time of the incident. Persons who develop PTSD experience disruptions in the way their brains and bodies manage stress. Their "fight or flight" responses become overly sensitive and trigger excessive reactions to innocuous stimuli.

> A growing body of research indicates that persons with PTSD have disruptions in parts of their brains that are responsible for inhibiting fear responses and exercising appropriate judgment and impulse control particularly during emotionally intense situations. The type of relationship that Mr. Williamson described that existed

between he, the victim, and the girlfriend was one of chronic ...
stress and one that evoked intense emotions in all involved parties.

It is possible that due to Mr. Williamson's untreated PTSD
condition and the intensity of the emotional circumstances, ... Mr.
Williamson misperceived environmental signs of danger and
reacted in an impulsive protective manner. In such a state it is
possible that he lacked the capacity to exercise reflection and
judgment prior to shooting the victim. The degree to which Mr.
Williamson was under the influence of alcohol at the time may
have also impaired his ability to reflect and exercise judgment
prior to acting.

The Petitioner testified that he met with counsel six to eight times before the trial
but acknowledged they may have met as many as twelve times. He said that not
all of their meetings were private and that most were short and pertained to the
day's court proceedings. He said one or two of the meetings were lengthy and
involved questions and answers. He said they never discussed his background,
life, or things not necessarily related to the case. Their conversations about the
day of the crime pertained mainly to the events at his apartment until he turned
himself in. He said counsel did not seem concerned with earlier events of the day.
He acknowledged, though, that he testified about the victim's prior threats, an
incident in which the victim tried to run him off the road, meeting the victim at
the bank and the victim's pounding on a car, a telephone call with the victim on
the Monday before the crime, and his joining a different gym to avoid the victim.
He said he and counsel never discussed his alcohol consumption other than the
two and one-half beers he drank on the night of the crime. He said he did not
understand its relevance and would have given counsel more information if he
had been asked. He said that at the time of the trial, he thought counsel knew the
facts of the case.

The Petitioner testified that he met with co-counsel two or three times before the
trial. He said the first meeting was at the jail via video conference and was an
introductory meeting. He said co-counsel stated that the facts presented a clear
case of self-defense and that the Petitioner was looking at nothing worse than
"involuntary manslaughter." He said the second meeting was "through the glass"
around Christmas and was a "general hello visit." He thought he did not meet
again with co-counsel until during the two-week period before the trial. The
meeting was the first time in which co-counsel asked the Petitioner about the
relevant events surrounding the incident. The Petitioner said co-counsel never
asked about his drinking habits, his background and social history, and what he
did before he went to his apartment on the night of the crime.

The Petitioner testified that he was unable to speak freely with Ms. Waltz because
their meeting was not private. He said that he was truthful when he told her he
had two or three beers at home and that he misunderstood the time period about

31

which he was asked. He said he never discussed with Ms. Waltz or counsel that he had been drinking all afternoon.

The Petitioner acknowledged that he received discovery documents fairly early in the case. He said a member of co-counsel's staff instructed him how to send legal mail from the jail and explained how to provide co-counsel with his notes from the discovery. He thought he provided his discovery notes to counsel on a court date and said he gave counsel more notes on the day the trial began. Of concern to him in the discovery was Mr. Clark's statement about premeditation. He thought Mr. Clark overstated what the Petitioner actually said. He acknowledged that he and Mr. Clark were good friends and that he told Mr. Clark he shot the victim.

The Petitioner testified that a long period of time passed without any court proceedings or hearing from the attorneys and that he wrote to them because he was concerned he had not heard anything. He said they wrote back stating that things were going as planned.

The Petitioner testified that before he turned himself in on the night of the crime, he left his cell phone with his mother for her to give to counsel. He understood that counsel was going to save his voice messages to a CD in order for the messages to be played at the trial. He said he learned right before he testified that it was not possible. He said that counsel asked him to unlock the phone in order for the messages to be played from the phone but that the messages were not saved on the phone because the service had lapsed. He thought a message existed about stopping to bid on a job after he left where he worked all day on the day of the crime. He identified documents containing printouts of text messages that had been stored on his cell phone. Post-conviction counsel stated that some of the messages were not introduced at the trial. The Petitioner noted that one of the messages that was not introduced at the trial was from him to Ms. Holmes about his stopping to bid on a job after work. He said he, Mr. McKinnon, and their co-worker shared a twelve-pack of beer between the job site and the bid location and shared a second twelve-pack on the way from the bid location to Ms. Creasy and Mr. McKinnon's house, where they continued drinking.

The Petitioner thought he found out about the mental health evaluation the day before it was to take place. He said he was told his lawyer would talk to him the next day, although he did not specify which attorney was to speak to him. He said that he was told the attorneys wanted him to talk to Dr. Montgomery to see what the doctor would say but that he was not told what to expect or what he might be asked.

Regarding the civil case against the victim's estate, the Petitioner testified that co-counsel told him it would allow them to take depositions, to have subpoena power, and to know if the witnesses would say something different in deposition testimony than in their police statements. He said that co-counsel never led him to believe the civil case had a purpose other than to obtain discovery for the criminal

32

case and that co-counsel told him at some point the civil case had been dropped. He said the attorneys made the civil case sound like something that was a typical defense attorney tactic. He said he never discussed the fees for the civil case with counsel or co-counsel.

*Williamson v. State*, 476 S.W.3d at 409-17. The Tennessee Court of Criminal Appeals then analyzed Petitioner's ineffective assistance of counsel claim in relation to the inadmissibility of the mental health evidence as follows:

# I
## Failure to Investigate, Develop, and Present Evidence to Challenge Mens Rea

In several related issues, the Petitioner contends that his trial attorneys provided ineffective assistance by failing to investigate and develop evidence to challenge the State's proof of the culpable mental state required for first degree murder and by failing to offer the evidence at the trial. The Petitioner's allegations relate to the failure to obtain a prompt psychiatric evaluation and to offer testimony of a mental health expert at the trial. He also contends that the post-conviction court erred in ruling that Dr. Montgomery's testimony would have been inadmissible if the defense had attempted to present it at the trial. The State contends that because the post-conviction court did not err in ruling that Dr. Montgomery's testimony was inadmissible, the Petitioner cannot establish the prejudice prong of an ineffective assistance of counsel claim.

### A. *Deficient Performance*

We begin with consideration of whether counsel and co-counsel performed deficiently. The record reflects that both trial attorneys met with the Petitioner and that the Petitioner's parents and Mr. McKinnon maintained some level of communication with the attorneys, particularly co-counsel. Ms. Waltz met with the Petitioner shortly after the crime at co-counsel's direction, and her report reflects that the Petitioner recounted the victim's history of harassment and aggression toward the Petitioner.

Counsel testified that he and co-counsel divided the trial preparation duties and that co-counsel was responsible for consulting and retaining a mental health expert, but he acknowledged that in hindsight, they should have involved a mental health expert earlier in the case and said no reason existed for the delay. Both counsel and co-counsel testified that the defense was based upon the Petitioner's reaction to the victim's ongoing harassment. Nevertheless, the effort to obtain expert assistance came about only shortly before the July 13, 2009 trial, and the expert was provided with minimal information. The attorneys did not mention the possibility of a mental health expert at the June 29, 2009 pretrial conference, and the evaluation had not yet taken place. Dr. Montgomery testified that according to his records, he and one of the Petitioner's attorneys had two brief conversations, each of which was less than six minutes in duration. His invoice, which was received as an exhibit, shows charges for telephone conversations of 0.10 hour

33

each with co-counsel on July 1 and 6, 2009. It also reflects charges for travel to and from the jail and a meeting with the Petitioner on June 30, 2009.

The post-conviction exhibits show that the Petitioner's trial attorneys filed a series of notices of intent to offer expert proof on July 6 and 7, 2009, and that the State filed a response alleging that the notices were "faulty as to notice given to the State," that they were "inadequate as to the particularity" of the nature of Dr. Montgomery's testimony, that the testimony was irrelevant, and that the State had not received an expert report. Hours after the State filed its response, co-counsel filed an amended notice stating that Dr. Montgomery's testimony related to the Petitioner's mental state, which included PTSD resulting from the victim's constant threats. The State filed an amended notice to exclude the expert testimony which noted the untimeliness of the defense motion and contended that no good cause existed to allow late filing of the motion. The defense withdrew the notice on the first day of the trial, and Dr. Montgomery did not testify.

The post-conviction court found that the Petitioner's trial attorneys did not perform deficiently in choosing not to offer Dr. Montgomery's testimony. The court did not specifically address, however, the failure to obtain a timely mental health evaluation. Upon review, we conclude that in light of the facts of the case and the chosen defense theory, the failure to consult a mental health expert and to obtain an evaluation of the Petitioner in a timely manner was deficient performance. The facts available to the Petitioner's attorneys at the time warranted prompt consultation with a mental health expert regarding mens rea and PTSD.

Regarding the Petitioner's allegation that the trial attorneys failed to investigate the Petitioner's alcohol use as a component of a mental health defense, the post-conviction court found that no proof showed the Petitioner was "under the influence to any extent that affected his ability ... to premeditate." The Petitioner's account to his attorneys, Ms. Waltz, and Dr. Montgomery of the amount of alcohol he consumed on the night of the crime, his account of his customary alcohol consumption, and counsel's personal observations of the Petitioner on the night of the crime do not support a finding of deficient performance in the investigation of or consultation with an expert regarding the Petitioner's alcohol use for the purpose of supporting a mental health defense. See *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052 (stating that the reasonableness of counsel's actions should be evaluated in light of information provided by a defendant to counsel).

### B. *Prejudice*

Because we have found deficient performance by counsel and co-counsel, the question becomes whether the Petitioner was prejudiced by their failure to obtain a prompt mental health evaluation. The post-conviction court found that the Petitioner failed to prove by clear and convincing evidence that he was prejudiced because Dr. Montgomery's testimony did not meet the standards for admissibility and would not have been admitted at the trial.

34

In a criminal prosecution, the State has the burden of proving beyond a reasonable doubt that a defendant possessed the required mens rea. *See* T.C.A. § 39–11–201(a)(2) (2014) In this case, the State was required to prove that the Petitioner committed an unlawful, premeditated, and intentional killing of the victim. *See* T.C.A. §§ 39–13–201 (2014), 39–13202 (2014). In order to rebut the State's proof of mens rea, "evidence of a defendant's mental condition can be relevant and admissible in certain cases [.]" *State v. Abrams*, 935 S.W.2d 399, 402 (Tenn. 1996); *see also State v. Phipps*, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994). Tennessee recognizes the right of a defendant to present expert proof to negate the existence of the culpable mental state required for the offense. *State v. Hall*, 958 S.W.2d 679, 679–80 (Tenn. 1997); *State v. Ferrell*, 277 S.W.3d 372, 379 (Tenn. 2009); see T.C.A. § 39–11–203(e)(1) (2014) (recognizing as a ground of defense the negation of an element of an offense). The so-called rule of diminished capacity " '[p]roperly understood ... is not a defense at all but merely a rule of evidence.' " *Hall*, 958 S.W.2d at 688–89 (quoting *United States v. Pohlot*, 827 F.2d 889, 897 (3d Cir. 1987)); *see also State v. Adams*, 405 S.W.3d 641, 660 (Tenn. 2013).

**1. Admission Pursuant to the Tennessee Rules of Evidence and State v. Hall**
"When ... a defendant seeks to utilize expert testimony to negate an element of the offense, trial courts must consider the evidentiary principles pertaining to relevancy and expert testimony as set forth in the Tennessee Rules of Evidence." *Ferrell*, 277 S.W.3d at 380 (citing *Hall*, 958 S.W.2d at 689). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Regarding the admissibility of expert testimony, Tennessee Rule of Evidence 702 provides, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Rule 703 provides,

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence[.]

Whether to admit expert testimony is within the sound discretion of the trial court. *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). A trial court's ruling will be

reversed only if the lower court abused its discretion, which requires a showing that the court " 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.' " *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)).

In the present case, the post-conviction court found that Dr. Montgomery was a qualified expert witness but that his testimony would not have been admissible at the trial because it did not meet the relevance and reliability requirements of the Rules of Evidence and the Hall threshold for diminished capacity to form the requisite mental state evidence. The court noted that although Dr. Montgomery diagnosed the Petitioner with PTSD related to the victim's ongoing harassment and threats, the doctor could only state that it was possible the Petitioner's untreated PTSD and the intense emotional circumstances caused the Petitioner to misunderstand the situation and that it was possible the Petitioner lacked the capacity to exercise reflection and judgment before shooting the victim. The court noted, as well, that Dr. Montgomery could only state that it was possible the Petitioner's ability to reflect and exercise judgment was affected by alcohol impairment.

Dr. Montgomery's testimony and report reflect his opinion that the Petitioner suffered from PTSD and that the Petitioner's PTSD and alcohol consumption significantly impaired the Petitioner's ability to exercise reflection and judgment. Dr. Montgomery testified, though, that he thought it was possible the Petitioner lacked the capacity to exercise reflection and judgment due to the PTSD and alcohol consumption, but he was unwilling state [*sic*] that it was his expert opinion that the Petitioner lacked the capacity to do so.

In *State v. Hall*, our supreme court concluded "psychiatric evidence that the defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee law." 958 S.W.2d at 689. The *Hall* court provided the following admonition:

> [W]e emphasize that the psychiatric testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular emotional state or mental condition. It is the showing of a lack of capacity to form the requisite culpable mental intent that is central to evaluating the admissibility of expert psychiatric testimony on the issue.

*Id.* at 690 (citing *State v. Shelton*, 854 S.W.2d 116, 122 (Tenn. Crim. App. 1992)). When presented on subsequent occasions with questions involving the admissibility of expert proof, the supreme court has adhered to the parameters of

*Hall. See*, *e.g.*, *Ferrell*, 277 S.W.3d at 378–79; *State v. Faulkner*, 154 S.W.3d 48, 56–57 (Tenn. 2005).

Our supreme court's decision in *State v. Hatcher*, 310 S.W.3d 788 (Tenn. 2010), is instructive. In Hatcher, the juvenile defendant participated with his older brother and another co-defendant in the shootings of three victims.

> The defense theory ... was that he was so frightened of his brother Chris that he participated in the shootings with less than the culpable mental state required for premeditated murder or attempted premeditated murder. That is, the defense argued that [the defendant's fear of his brother] prevented him from acting intentionally and with premeditation while he participated in the shooting.

*Hatcher*, 310 S.W.3d at 808. The defense relied upon the defendant's testimony to support its theory and did not offer expert proof. The defense sought a special jury instruction to support its theory that the defendant's fear of his brother negated the culpable mental state. In determining whether the trial court properly denied the request, the supreme court looked to *Hall* for guidance. The *Hatcher* court noted that the defense theory relied upon "a particular emotional state or mental condition" but not a "lack of capacity to form the requisite mental intent." *Id.* at 805–07 (quoting *Hall*, 958 S.W.2d at 690). For this reason, the court concluded, the trial court properly denied the requested instruction. *Id.* at 807. Although Hatcher involved a jury instruction question, it nevertheless provides guidance regarding the principles of *Hall*.

This court recently faced a situation similar to the Petitioner's in *State v. Tray Dontacc Chaney*, No. W2013–00914–CCA–R9–CD, 2014 WL 2016655 (Tenn. Crim. App. May 14, 2014), *perm. app. denied* (Tenn. Sept. 18, 2014). In that case, the State appealed the trial court's denial of its motion in limine to exclude the testimony of a defense psychologist who would testify that the defendant's borderline intellectual capacity combined with related situational factors "eroded" the defendant's capacity to premeditate. The State sought exclusion of the evidence because the expert could not testify unequivocally that the defendant was unable to form the required mens rea. This court examined *Hall*, *Faulkner*, *Ferrell*, and unreported Court of Criminal Appeals cases and concluded that the evidence was irrelevant and inadmissible and that the trial court abused its discretion in denying the State's motion in limine to exclude the evidence. In so holding, this court reasoned:

> [T]he case law holds that expert testimony regarding a defendant's mental state is relevant and admissible only to establish that, at the time of the crimes, the defendant lacked the capacity to premeditate. Since Dr. Kennon's testimony did not do so, we

conclude that the trial court erred in finding that the testimony was admissible.

*Tray Dontacc Chaney*, 2014 WL 2016655, at *9; *see State v. Herbert Michael Merritt*, No. E2011–01348–CCA–R3–CD, 2013 WL 1189092, at *27 (Tenn. Crim. App. Mar. 22, 2013) (holding that the trial court did not abuse its discretion in excluding evidence that the defendant's mental disease or defect impaired or reduced his ability to form the required mens rea, rather than stating that the defendant "completely lacked the capacity to commit premeditated first degree murder"), *perm. app. denied* (Tenn. Aug. 13, 2013); *State v. Robert Austin*, No. W2005–01963–CCA–R3–CD, 2007 WL 2624399, at *6 (Tenn. Crim. App. Sept. 10, 2007) (holding that although the trial court erred in ruling that an expert witness could not testify about the ultimate issue of the defendant's mental state, the error was harmless because testimony that the defendant's mental disease merely "impacted" his capacity to form the required mental state was inadmissible under Hall); *State v. Antonio D. Idellfonso–Diaz*, No. M2006–00203–CCA–R9–CD, 2006 WL 3093207, at *4 (Tenn. Crim. App. Nov. 1, 2006) ("The fact that the [defendant's] mental disease impaired or reduced his capacity to form the requisite mental state does not satisfy the two-prong requirement in *Hall* and *Faulkner*."), *perm. app. denied* (Tenn. Feb. 26, 2007).

The Petitioner argues in his reply brief that other post-*Hall* cases, including *Ferrell*, do not support a narrow construction of *Hall*. We disagree. We note that *Ferrell* stands for the proposition that evidence to negate the mens rea is not limited to expert psychiatric testimony. 277 S.W.3d at 377–81. The Petitioner also argues that *Hatcher* stands for the proposition that *Hall* should not be rigidly applied. He notes that *Hatcher* quoted the pattern jury instruction for evidence of mental state and contends that the instruction contains language that indicates the evidence regarding mental state should be admitted even if it is stated in less than certain terms. We disagree with his reading of *Hatcher* and the pattern instruction. The pattern jury instruction informs the jury of the matters it must resolve as the trier of fact, whereas the admissibility of expert proof is determined by the trial judge and governed by the Rules of Evidence and *Hall*. The proffered evidence still must show that a defendant suffered from a mental disease or defect, not just a particular emotional state or mental condition. To the extent that the Petitioner seeks to utilize the pattern instruction as a guide to the admissibility of evidence by a trial court, rather than evaluation by a jury of evidence that has been properly admitted, his argument is misplaced. *See Hatcher*, 310 S.W.3d at 804–07; T.P.I.–Crim. 42.22 (18th ed. 2014) (evidence of mental state).

We have also rejected the Petitioner's argument that the proposed evidence in *State v. Vaughn*, 279 S.W.3d 584 (Tenn. Crim. App. 2008), was stated with no greater certainty than were the opinions expressed by Dr. Montgomery in the present case. As relevant here, *Vaughn* involved the denial of a defense motion for a continuance and denial of funds for expert assistance. In support of the motion, an expert had submitted an affidavit stating that the defendant's voluntary

intoxication "may have rendered him unable to form the requisite mens rea for the alleged actions in accordance with the criteria listed *State v. Hall* and T.C.A. 39–11–503." *Id.* at 597, n.9. In concluding that the trial court erred in revoking the funds for expert assistance, the court said expert testimony on the issue of voluntary intoxication was relevant and admissible pursuant to *Hall*, but the court did not state that the proposed expert's opinion, as stated in the affidavit, would be admissible evidence at a trial. *Id.* at 597–602.

We have considered the other cases upon which the Petitioner relies. *See Adams*, 405 S.W.3d 641; *Mobley v. State*, 397 S.W.3d 70 (Tenn. 2013); *Shuck*, 953 S.W.2d 662; *State v. Don Sanders*, W2006–02592–CCA–R3–CD, 2008 WL 1850934 (Tenn. Crim. App. Apr. 22, 2008); *State v. Maurice Lamont Davidson*, No. M2002–00178–CCA–R3–CD, 2003 WL 151202 (Tenn. Crim. App. Jan. 22, 2003), *perm. app. denied* (Tenn. May 19, 2003). These cases do not support the Petitioner's argument that equivocal expert testimony is permitted.

Based upon our review of the law, we conclude that the post-conviction court did not err in determining that Dr. Montgomery's testimony would have been inadmissible pursuant to the Rules of Evidence and *Hall*. Dr. Montgomery stated only that it was a possibility that due to a mental disease or defect, the Petitioner lacked the capacity to form the required mens rea. Although Dr. Montgomery was able to state an opinion with certainty regarding the Petitioner's PTSD and substance use disorder diagnoses, evidence of these diagnoses was not relevant and admissible without an opinion regarding the ultimate issue of the Petitioner's capacity to form the required mens rea.

**2. *Admission Pursuant to the Right to Present a Defense***

The post-conviction court also considered the Petitioner's contention that notwithstanding the Rules of Evidence, due process required admission of the expert proof because its exclusion deprived him of the opportunity to present a defense. *See State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000) ("The Sixth Amendment and the Due Process Clause of the Fourteenth Amendment clearly guarantee a criminal defendant the right to present a defense which includes the right to present witnesses favorable to the defense."). In determining whether due process requires admission of evidence, notwithstanding the Rules of Evidence, our supreme court has said,

> The facts of each case must be considered carefully to determine whether the constitutional right to present a defense has been violated by the exclusion of evidence. Generally, the analysis should consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important. *See Chambers* [*v. Mississippi* ], 410 U.S. [284] at 298–301, 93 S.Ct. [1038] at 1047–49 [35 L.Ed.2d 297 (1973) ].

39

*Brown*, 29 S.W.3d at 433–34.

The post-conviction court conducted an analysis of the *Brown* factors and concluded that the Petitioner was not deprived of the opportunity to present a defense by the exclusion of the evidence. The court noted that the Petitioner testified and was able to present a defense despite the exclusion. It likewise observed that the evidence did not bear indicia of reliability because it showed that the Petitioner was under stress and had strong emotions from the conflict with the victim but not that he was incapable of committing first degree murder. The court noted the trial evidence that the Petitioner said, "You just got him killed," before leaving his house, that he took a loaded gun to the victim's house to create a conflict, that he drove thirteen miles over the course of twenty minutes to get there, that the victim put up his hands and said, "What's up?" before the Petitioner shot him, that the Petitioner fired thirteen shots with some striking the victim's back, that the Petitioner left the scene with the victim dying in the street, and that he disposed of the gun. The court also found that the evidence "doesn't even begin to approach" reliability. Regarding the importance of the interest supporting exclusion, the court noted that the right to present a defense would not apply if there were no evidence to present and that Dr. Montgomery would not provide evidence to support an available defense. Upon review, we conclude that the court did not err in its determination.

We return, then, to the question of whether the Petitioner has established the prejudice prong of an ineffective assistance of counsel claim. Because Dr. Montgomery's testimony would not have been admissible if he had been called as a trial witness, the Petitioner failed to show prejudice. The Petitioner is not entitled to relief on this basis.

*Williamson v. State*, 476 S.W.3d at 418–24.

To resolve the Parties' dispute regarding the reviewability of Petitioner's claim by the federal courts, the undersigned finds Petitioner's claim is reviewable in federal court. Petitioner's claim is that the state courts in which he was denied relief from applied a rule of law that is contrary to or an unreasonable application of clearly established federal law and that the state courts unreasonably determined the facts they based their decision on. Thus, such claims are reviewable by the federal courts pursuant to 28 U.S.C. § 2254(d)(1)-(2).

Petitioner's first argument is that "[t]he exclusion of Dr. Montgomery's [t]estimony 'infringed upon a weighty interest' of [Petitioner] and was 'arbitrary' or 'disproportionate to the

40

purposes the rules are designed to serve.'"  Docket No. 31, page 38.  Specifically, Petitioner challenges the constitutionality of the Tennessee rule from *State v. Hall*, 958 S.W.2d 679 (Tenn. 1997) as it was applied to his case.  In *State v. Hall*, the Tennessee Supreme Court stated that the psychiatric evidence presented to negate *mens rea*[7] must "demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular emotional state or mental condition."  *Id.* at 690.  In meeting that requirement, all that is required is that the evidence "must satisfy the general relevancy standards as well as the evidentiary rules which specifically govern expert testimony."  *Id.* at 689. Although the Tennessee Court of Criminal Appeals has criticized *Hall* in an unpublished opinion (*see State v. Wilson*, No. M201401487CCAR9CD, 2015 WL 5170970, at *9 (Tenn. Crim. App. Sept. 2, 2015)), such criticism is not binding on this Court; further, *Hall* remains the standard in Tennessee for admitting mental health evidence to negate *mens rea*.  *See generally State v. Wilson*, No. M201701950CCAR3CD, 2019 WL 246249 (Tenn. Crim. App. Jan. 17, 2019), *perm. app. denied* (May 16, 2019).  For the following reasons, the undersigned finds that Tennessee's standard from *Hall* applied in Petitioner's case is not contrary to or an unreasonable application of clearly established federal law.

In *Clark v. Arizona*, the Supreme Court of the United States held as constitutional Arizona's prohibition on evidence offered to negate *mens rea* while at the same time allowing evidence to establish a defense of insanity.  548 U.S. at 779.  In its reasoning, the Supreme Court stated "'[w]hile the Constitution prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to

---

[7] *Mens rea* is "[t]he state of mind that the prosecution, to secure a conviction, must prove that a defendant had when committing a crime.  MENS REA, Black's Law Dictionary (11th ed. 2019).

promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.'" *Id.* at 770 (quoting *Holmes*, 547 U.S. at 326). Additionally, the Sixth Circuit Court of Appeals in *Wong v. Money* held that Ohio's prohibition on evidence "to show that she lacked the mental capacity to form the specific mental state required for a particular crime or degree of crime," (*Wong*, 142 F.3d at 323) (quoting *Ohio v. Wilcox*, 436 N.E.2d 523, 533 (1982)), did not violate the right to present a defense. *Wong*, 142 F.3d at 326. These cases are helpful in analyzing Petitioner's claim.

Because states have the ability to prohibit the introduction of mental health evidence offered to negate *mens rea* altogether, it follows that Tennessee's requirement set forth in *Hall* is also constitutionally permissible. Tennessee allows the introduction of evidence to negate *mens rea*, but only requires that the evidence show the defendant's "mental disease or defect" caused the defendant to be unable to form the required *mens rea*. The only other requirement is that the evidence meet Tennessee's relevancy and expert testimony standards required for all other evidence. *See Hall*, 958 S.W.2d at 689-90. In fact, the *Hall* court stated that a heightened requirement for such evidence "would deprive a criminal defendant of the right defend against one of the essential elements of every criminal case." *Id.* at 689 (quoting *State v. Phipps*, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994). The undersigned does not find the above standard to be arbitrary, mechanistic, or one that is disproportionate to the purposes it is designed to serve. *See Clark*, 548 U.S. at 770 (quoting *Holmes*, 547 U.S. at 326)). In sum, the undersigned finds Tennessee's rule in *Hall* governing the admissibility of psychiatric evidence to negate *mens rea* to be neither contrary to or an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

Contrary to Petitioner's position that the question presented under § 2254(d)(1) is actually the rejection of opinion evidence showing "more than likely" and instead requiring evidence "to a reasonable degree of medical certainty," the record does not show that to be the issue presented by Petitioner's case. Petitioner supports his argument by citing to Dr. Montgomery's testimony regarding the amount of certainty in his opinion. However, the trial court found several credibility issues with Dr. Montgomery's testimony that are traditionally unreviewable by a federal court in habeas proceedings. *See Otte v. Houk*, 654 F.3d 594, 601 (6th Cir. 2011) ("For a federal habeas court to overturn a state court's credibility judgments, the state court's error must be stark and clear." (*quoting Larry v. Branker*, 552 F.3d 356, 370 (4th Cir. 2009))). Having made those credibility determinations, it then found that Dr. Montgomery's testimony did not meet the required evidentiary standards. The Tennessee Court of Criminal Appeals' decision to affirm the trial court's decision was based on those factual and credibility determinations. The undersigned understands Petitioner's above argument relates to the facts as determined by the state courts as opposed to an issue with the law applied to his case in those proceedings. Therefore, Petitioner's contention that he is entitled to relief under 28 U.S.C. § 2254(d)(1) on this ground is without merit.

Petitioner's second argument is that the state courts' rulings "were also incorrect because [they] were based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding[s]." Docket No. 31, page 45. Dr. Montgomery's testimony showed several instances where he could not identify how certain his opinion was. As a result, the trial court found Dr. Montgomery's opinion to have credibility and reliability issues as a whole. For example, Dr. Montgomery's report stated that he thought it was possible Petitioner's PTSD would have caused him to not be able to form the required *mens rea*.

43

Although Dr. Montgomery testified that he thought by "possible" he meant "it was perhaps more likely than not" (Docket No. 20-13, pages 186:16-25 – 187:1-7), he also testified that he knew what the elements of first-degree murder were but was unable to opine that Petitioner could not have formed the "requisite culpable mental state" for first-degree murder. *Id.* at 207:15-25 – 208:1-2. Further, Dr. Montgomery's opinion was based on limited information provided and was formed in a short amount of time. Docket No. 20-15, page 35:3-9. Based on those reasons, the trial court found and the appellate court affirmed that the evidence was inadmissible under Tennessee Rules of Evidence 401 and 403. *Id.* at 34:19-23. As Petitioner has not shown a basis for deviating from the deference given to the state courts' credibility determinations, the undersigned is bound by them. *See Otte*, 654 F.3d at 601. Additionally, Petitioner has not defeated the presumption of correctness of the state courts' factual findings by showing clear and convincing evidence that they were unreasonably made. The undersigned finds that Petitioner's claim on this ground does not meet the standard set forth in 28 U.S.C. 2254(d)(2) for establishing an entitlement to habeas corpus relief.

Having reviewed the entire record in the present case, the undersigned finds that Petitioner did not meet his burden of establishing that the state courts' decision on this ground was "contrary to, or involved an unreasonable application of, clearly established Federal law," nor did he show that the decision "was based on an unreasonable determination of the facts in light of the evidence presented in State court proceeding." *See* § 2254(d)(1)-(2). Thus, Petitioner is not entitled to relief on this ground.

### 3. Ineffective Assistance of Counsel

#### a. Exhaustion

Petitioner raised this claim and related sub-claims during his state post-conviction proceedings, (*see* Docket No. 20-12), and appealed the denial of his claim and sub-claims to the

44

Tennessee Court of Criminal Appeals.  Docket No. 20-17.  The Tennessee Court of Criminal Appeals reviewed his claim on the merits; therefore, Petitioner has fully exhausted this claim and sub-claims in the available state proceedings.  *See State Williamson v. State*, 476 S.W.3d 405.

### b.  Merits

Lastly, Petitioner contends on various grounds that he was denied effective assistance of counsel.[8]  Petitioner first argues that he was denied effective assistance of counsel when "the Tennessee Court of Criminal Appeals [held] that he was not prejudiced by his counsel's deficient performance in failing to conduct a timely investigation into mental health defense at the time of the offense" (Docket No. 31, page 5; *see* Docket No. 1, pages 10-11; Docket No. 7, page 6) and when "the Tennessee Court of Criminal appeals [held] that he was not prejudiced by counsel's deficient performance in failing to investigate and preserve cell phone records and voice messages." *Id.*; *see* Docket No. 1, pages 11-12.  In addition, Petitioner claims the following deficiencies of his counsel prejudiced his defense such that he was denied effective assistance of counsel: (1) "Failure to investigate petitioner's alcohol use" (*Id.* at 6 (citing Docket No. 1, page 12 subsection A(1)(e)); (2) "Failure to effectively interview the petitioner" (*Id.* (citing Docket No. 1, page 13 subsection A(1)(f)); and (3) "Failure to conduct effective interviews of Roger Williamson (Petitioner's father), Maria Creasy (Petitioner's mother), and John Michael McKinnon." *Id.* (citing Docket No. 1, page 15 subsection A(5)), including the "Failure to Investigate Petitioner's Alcohol Use" (*Id.* at 6-7 (citing Docket No. 1 at 12)); "Failure to Investigate Additional Issues including 'investigation over how distraught Mr. Williamson was

---

[8] In Petitioner's Reply, he conceded "[w]hile Mr. Williamson's initial petition alleged additional sub-claims regarding counsel's deficient performance, they do not need review by this Court." Docket No. 31, page 7.  Accordingly, the undersigned will proceed by stating the claims Petitioner asserts in his Reply to State's Answer as they appear in his brief.  The undersigned will then, for clarity purposes, review those claims in separate headings as they were analyzed by the state courts.

over his relationship with Ms. Holmes[,] how he was affected by the threats from Grady Carter[,] his overall fear of Grady Carter[,] and developing evidence to support the self-defense claim made at trial" (*Id.* at 7 (citing Docket No. 1 at 13)); and "Trial Counsel Failed to Call Necessary Witnesses." *Id.* (citing Docket No. 1 at 16).

The Sixth Amendment, as applied to the states through the Fourteenth Amendment, guarantees a criminal defendant the right to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 686-87 (1984); *see generally Gideon v. Wainwright*, 372 U.S. 335, 342 (1963). To substantiate a claim that his counsel was ineffective, a petitioner must prove: (1) that his "counsel's performance was deficient" and (2) that his counsel's "deficient performance prejudiced the defense." *Id.* at 687. "Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* In a court's application of the *Strickland* standard, it is not required that the court analyze one prong before the other nor is it necessary "to address both components of the inquiry if the [petitioner] makes an insufficient showing on one." *Id.* at 697.

In establishing that a petitioner's counsel was deficient, it must be shown that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the [petitioner] by the Sixth Amendment." *Id.* at 687. In other words, counsel's performance must have fell "'below an objective standard of reasonableness.'" *Campbell v. Coyle*, 260 F.3d 531, 551 (6th Cir. 2001) (quoting *Strickland*, 466 U.S. at 688). The standard for measuring performance under the deficiency prong is "'reasonableness under prevailing professional norms.'" *Id.* (quoting *Strickland*, 466 U.S. at 688). Measuring counsel's performance requires deference to be given to counsel's decisions, including "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S.

at 689. Accordingly, a petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Further, to show prejudice to the defense "requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Id.* at 687. In other words, a petitioner must show "by 'a reasonable probability that, but for counsels' errors, the result of the proceeding would have been different.'" *Sylvester v. United States*, 868 F.3d 503, 511 (6th Cir. 2017) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In making this showing, "it is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. "A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* at 695.

The Tennessee Court of Criminal Appeals reviewed Petitioner's claims under the following standard of review:

> Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40–30–103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40–30–110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State,* 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State,* 40 S.W.3d 450, 456–57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields,* 40 S.W.3d at 457–58.
>
> The Petitioner contends that he was denied the effective assistance of counsel. To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced

47

the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see Lockhart v. Fretwell,* 506 U.S. 364, 368–72, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson,* 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley,* 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State,* 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered ..., are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State,* 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State,* 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed ... based upon adequate preparation." *Cooper v. State,* 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

*Williamson v. State*, 476 S.W.3d at 417-18.

> ### i. Counsel's Investigation into a Mental Health Defense, including Investigation of Petitioner's Alcohol Consumption Relative to Negating *Mens Rea*.

Petitioner argues that he was denied ineffective assistance of counsel when "the Tennessee Court of Criminal Appeals [held] that he was not prejudiced by his counsel's deficient performance in failing to conduct a timely investigation into mental health defense at the time of the offense" (Docket No. 31, page 5; *see* Docket No. 1, pages 10-11; Docket No. 7, page 6). As support, Petitioner states that Dr. Montgomery had been contacted by counsel "only shortly before his evaluation and had not been provided any of the information he usually receives from

48

counsel prior to an evaluation. Docket No. 7, page 6. Also, "Dr. Montgomery further testified that he had been provided additional information by post-conviction counsel and as a result concluded that in addition to [Petitioner's] ability to premeditate being affected by PTSD, it was further adversely affected by his ingestion of a large amount of alcohol during the afternoon and evening of the offense." *Id.* at 7; *see also* Docket No. 1, page 12. Petitioner further states that "the court ignored evidence that Adrian Holmes, who had been with [Petitioner] immediately prior to the shooting, had stated that [Petitioner] was drunk when he left their house. *Id.* at 7-8 (citing Docket No. 20-13, pages 180-81). Finally, Petitioner asserts Dr. Montgomery opined that Petitioner "'more likely than not lacked the capacity to premeditate' but he was not comfortable saying to a reasonable degree of medical certainty that [Petitioner] lacked the capacity." *Id.* at 9 (quoting Docket No. 20-13, pages 186-87).

In response to Petitioner's claim relating to the investigation of mental health evidence to negate *mens rea*, Respondent asserts that "[i]n rejecting the petitioner's claim, the state court both identified and reasonably applied *Strickland* as the controlling standard for challenges to the effectiveness of counsel, and the record fully supports its conclusions." Docket No. 21, page 37 (citing *Williamson*, 2015 Tenn. Crim. App. LEXIS 267, at *31-32). Respondent further states that "[b]ecause the petitioner has failed to demonstrate that the state court's adjudication of this ineffective-assistance claim involved an unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts in light of the evidence before the state court, he is not entitled to habeas relief." *Id.* at 38.

In response to Petitioner's claim relating to his counsel's failure to investigate his use of alcohol, Respondent asserts that the state court applied the standard set forth in *Strickland* and "rejected this aspect of the petitioner's claim of ineffective-assistance." *Id.* (citing *Williamson*,

2015 Tenn. Crim. App. LEXIS 267, at *31-32, 36). Respondent further states "[b]ecause the petitioner has failed to demonstrate that the state court's adjudication of this ineffective assistance claim involved an unreasonable application of clearly established federal law or was based upon determination of the facts in light of the evidence before the state court, he is not entitled to habeas relief." *Id*.

In reply to Respondent's arguments, Petitioner states that "[i]f it is true as the Court of Criminal Appeals found that because Dr. Montgomery's testimony was inadmissible, the failure to timely obtain his evaluation was not prejudicial, then the converse is also true: if Dr. Montgomery's testimony is admissible, then the failure to timely obtain the information was prejudicial." Docket No. 31, page 61. Petitioner further contends that "this Court should conclude that Dr. Montgomery's testimony is admissible and that Mr. Williamson was prejudiced by his counsel's deficient performance." *Id*. Additionally, Petitioner asserts that "'the post-conviction court found that the Petitioner failed to prove by clear and convincing evidence that he was not prejudiced because Dr. Montgomery's testimony did not meet the standards for admissibility and would not have been admitted at trial." Docket No. 31, page 60. Petitioner argues that a clear and convincing evidence standard is contrary to the standard established in *Strickland*. *Id* at 61.

As stated above in the preceding analysis under the right to present a defense, the Tennessee Court of Criminal Appeals addressed Petitioner's claim relating to his counsel's investigation of mental health evidence. *See Williamson v. State*, 476 S.W.3d at 418-424.

In the present case, Petitioner has not demonstrated that the state courts unreasonably applied or contradicted clearly established federal law. As shown above, the Tennessee Court of Criminal Appeals found counsel's performance in relation to timely investigating and submitting

50

Dr. Montgomery's testimony to be deficient but not prejudicial. In so finding, the appellate court stated that Petitioner had not been prejudiced by his counsel's actions because "Dr. Montgomery's testimony would not have been admissible if he had been called as a trial witness." *Williamson v. State*, 476 S.W.3d 405, 418-424. Since the standard set forth in *Strickland* requires a petitioner to demonstrate "'a reasonable probability that, but for counsels' errors, the result of the proceeding would have been different," *Sylvester*, 868 F.3d at 511 (quoting *Strickland*, 466 U.S. at 694), the fact that Dr. Montgomery's testimony was inadmissible under state law would preclude a finding of prejudice under *Strickland* absent evidence showing that Petitioner could have admitted such evidence through a different expert. As stated above in the related analysis to the right to present a defense, the state trial court's evidentiary finding was not contrary to or an unreasonable application of clearly established federal law and was not based on unreasonably determined facts. Petitioner has not presented evidence that the evidence could have been admissible despite his counsel's errors, nor has Petitioner shown the lack of such evidence in his trial had any more than just "some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Thus, Petitioner's argument is without merit.

Petitioner further raises concerns about the Tennessee Court of Criminal Appeals' statement that "'the post-conviction court found that the Petitioner failed to prove by clear and convincing evidence that he was not prejudiced because Dr. Montgomery's testimony did not meet the standards for admissibility and would not have been admitted at trial." Docket No. 31, page 60. The application of such standard, Petitioner asserts, is contrary to the standard set forth in *Strickland*. *Id.* at 61. The undersigned has considered Petitioner's claim; however, the record reflects that the Tennessee Court of Criminal Appeals correctly applied the *Strickland* standard.

51

Petitioner's arguments took place in the context of post-conviction hearing, in which the statutory standard for relief required proof of his allegations by clear and convincing evidence. *See Williamson v. State*, 476 S.W.3d at 417 (citing T.C.A. § 40–30–110(f) (2012). In reviewing Petitioner's appeal from the denial of post-conviction relief, the appellate court observed that standard but later applied the standard from *Strickland*. Therefore, the undersigned finds Petitioner's argument on this ground to also be without merit.

The post-conviction court then found counsel's performance in investigating Petitioner's alcohol use to be neither deficient nor prejudicial. As the appellate court stated, "the post-conviction court found that no proof showed the Petitioner was 'under the influence to any extent that affected his ability…to premediate.'" *Williamson v. State*, 476 S.W.3d at 419. Additionally, the appellate noted that Petitioner's attorneys knew the relevant facts regarding his alcohol consumption. *See Id.* Petitioner has not shown that the state courts' decision unreasonably applied or contradicted clearly established federal law; particularly, he has not met the requirement that he show his counsels' performance in investigating his alcohol consumption fell "'below and objective standard of reasonableness,'" *Campbell*, 260 F.3d at 551 (quoting *Strickland*, 466 U.S. at 688), or that such an error was reasonably probable to result in a different outcome in his proceeding. *See Sylvester*, 868 F.3d at 511 (quoting *Strickland*, 466 U.S. at 694). As a result, the undersigned finds that Petitioner is not entitled to habeas corpus relief on this ground.

### ii. Counsel's Failure to Investigate and Preserve Cell Phone Records and Voice Recordings

Petitioner next argues that the Court of Criminal Appeals' conclusion that he was not prejudiced by his counsel's deficient performance in failing to preserve phone records was an unreasonable application of or contrary to clearly established federal law. Docket No. 31, pages

61-62; *see also* Docket No. 1, pages 11-12; Docket No. 7, page 5.  In support of this argument in his Reply, Petitioner contends that "hearing the actual calls would have impact on a jury" and that "[t]his was yet another opportunity to persuade both the court of the need for the self-defense instruction and to convince the jury that [Petitioner] was telling the truth when he testified and described his fear of the victim."  *Id*. at 62.

Respondent contends that "the state court both identified and reasonably applied *Strickland* as the controlling standard for challenges to the effectiveness of counsel, and the record fully supports its conclusions."  Docket No. 21, at page 40 (citing *Williamson*, 2015 Tenn. Crim. App. LEXIS 267, at \*31-32; *Cullen v. Pinholster*, 563 U.S. 170, 188-89 (2011)).  Respondent further argues that "[b]ecause the petitioner has failed to demonstrate that the state court's adjudication of this ineffective-assistance claim involved an unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts in light of the evidence before the state court, he is not entitled to habeas relief."  *Id.*

As shown above, The Tennessee Court of Criminal Appeals reviewed the facts relevant to Petitioner's ineffective assistance of counsel claims.  *See Williamson v. State*, 476 S.W.3d at 418-424.  The appellate court then analyzed Petitioner's claim as follows:

> **A. *Failure to Investigate and Preserve Cell Phone Records and Voice Messages***
> The post-conviction proof showed that the Petitioner provided his cell phone to his mother before his arrest in order for her to provide it to counsel to obtain stored messages for use at the trial. Counsel testified that he hired a person with technical expertise to obtain messages from the Petitioner's cell phone. Co-counsel testified that he was responsible for obtaining the Petitioner's cell phone records, that he had trouble because the provider only maintained records for a short time, and that a subpoena was issued to the cell phone service provider on the Friday before the trial began the following Monday. At the trial, the defense was unable to play the voice messages because the Petitioner's cell phone service had lapsed.
>
> The post-conviction record reflects that counsel knew early in the case that the ongoing conflict between the Petitioner and the victim was important factually.

53

The Petitioner's mother provided counsel with the Petitioner's cell phone, but counsel took no immediate action to preserve any available voice messages. The failure to investigate and preserve any available evidence was deficient performance.

Turning to the question of prejudice, we note the Petitioner's trial testimony that he received text and voice messages from the victim and that approximately ninety-eight percent of them were threatening and 100% contained profanity. The Petitioner said that at one point, he filed a complaint with the Macon County Sheriff's Department and had an officer review threatening text and voice messages from the victim. The Petitioner read the content of some of the text messages to the jury and testified about the contents of the voice messages. He said that he had not saved some of the voice messages because of his cell phone's limited capacity. The Petitioner also testified in detail about in-person encounters with the victim. Macon County Sheriff's Deputy Ron Smith testified that in the process of taking a report from the Petitioner against the victim, he reviewed text messages and listened to voice messages, but he did not testify about the contents. The State acknowledged at the trial that the victim was disgruntled with the Petitioner and that the victim sent the text messages and left the voice messages for the Petitioner.

In assessing prejudice, we think it is significant that despite the inability to play the messages for the jury, the Petitioner was able to introduce evidence about their contents. The Petitioner argues that the victim's inflection and anger would have provided probative evidence to support Dr. Montgomery's testimony, had it been presented, of the Petitioner PTSD. As we have stated, Dr. Montgomery's testimony was inadmissible. We also note the State's acknowledgment at the trial that the victim was angry and hostile toward the Petitioner.

We cannot conclude that the Petitioner was prejudiced by counsel's failure to present the recorded voice messages at the trial. The Petitioner is not entitled to relief on this basis.

*Williamson v. State*, 476 S.W.3d at 424-425.

In the present case, Petitioner has not shown the above decision to be contrary to or an unreasonable application of clearly established federal law. As shown above, the Tennessee Court of Criminal Appeals concluded that Petitioner's counsel exhibited deficient performance in failing to preserve phone records, but such deficient performance did not prejudice Petitioner's defense. *See Id.* at 425. In reaching this conclusion, the appellate court found it "significant" that Petitioner had the ability to, nonetheless, present the contents of those records to the jury and

54

that Dr. Montgomery's testimony was inadmissible regardless. *Id.* That conclusion is not an unreasonable application of or contrary to *Strickland*'s requirement that a petitioner must demonstrate not just "some conceivable effect on the outcome of the proceeding," (466 U.S. at 693), but instead "a reasonable probability that, but for counsels' errors, the result of the proceeding would have been different." *Id.* at 694. Because Petitioner has not shown that the state courts contradicted or unreasonably applied such standard in his case, Petitioner is unable to show an entitlement to relief under 28 U.S.C. § 2254(d)(1). Therefore, Petitioner is not entitled to habeas corpus relief on this ground.

### iii. Counsel's Failure to Conduct Interviews of Petitioner, Roger Williamson, Maria Creasy, and John McKinnon

Petitioner contends that his counsel's failure to conduct interviews of Roger Williamson, Maria Creasy, and John McKinnon constituted ineffective assistance of counsel. Docket No. 31, page 6 (citing Docket No. 1 at 15 subsection A(5); Docket No. 20-17 at 91-95; Docket No. 20-20 at 23; and Docket No. 21 at 44-46). In support of his argument that counsel's failure to interview Roger Williamson constituted ineffective assistance of counsel, Petitioner states in his reply brief that Mr. Roger Williamson had information about prior incidents between the victim and Petitioner that was "alluded to only as [the Sheriff's Deputy] being called to Mr. Williamson's father's residence." *Id.* at 63. Petitioner further states that, beyond a reference to an incident involving the victim chasing Petitioner to his home, "[t]here was no further description of the incident that was perhaps the most serious attempt to kill or seriously injure [Petitioner]." *Id.* Petitioner contends that "[b]ecause this incident was vitally important to showing [Petitioner's] rationale [*sic*] fear of Grady Carter, it was of fundamental importance to the self-defense theory used by counsel." *Id.* As a result, Petitioner contends, such information "was never known to

55

the jury nor to the trial and appellate courts who would rule on the request for a self-defense instruction." *Id.* at 64.

Additionally, Petitioner argues that Maria Creasy and John McKinnon "could have supplied valuable information regarding Mr. Williamson's alcohol use on the day of the offense and background information on Mr. Williamson's relationship with Ms. Holmes, including his attempts to break off the relationship in the days immediately preceding the shooting." *Id.* Petitioner concludes that "this testimony would have supported [Petitioner's] testimony that he had decided to leave Ms. Holmes and go to his mother's house just prior to the shooting." *Id.*

Finally, Petitioner asserts that "[t]here was no evidence that serious interviews were conducted with any of these witnesses;" "[o]nly Mr. Preston suggested such interviews and he claimed he interviewed Maria Creasy and John Michael McKinnon." *Id.* (citing Docket No. 20-13 at 90-93, 117). Due to the asserted lack of credibility on behalf of Mr. Preston, Petitioner requests this Court to review his claims under 28 U.S.C. § 2254(d)(1)-(2). *Id.*

Petitioner secondly contends that his counsel's "[f]ailure to effectively interview the petitioner" constituted ineffective assistance of counsel. *Id.* at 6 (citing Docket No. 1 at 12 subsection A(1)(f)); Docket No. 21 at 40-41. Petitioner contends that had his counsel effectively interviewed him, "they would have obtained valuable information about his alcohol intake, social history information that would have been valuable in understanding his emotional and psychiatric condition, and his true mental state at the time of the shooting." Docket No. 1, pages 13-14.

Respondent argues that Petitioner has not shown that the state courts adjudication of Petitioner's claims involved an unreasonable application of or contradiction to clearly

established federal law or that the facts were unreasonably determined in light of the evidence presented.  Docket No. 21, pages 40-41, 44-45.

As stated above, the Tennessee Court of Criminal Appeals reviewed the facts relevant to Petitioner's claim.  *See Williamson v. State*, 476 S.W.3d at 418-424.  The appellate court then analyzed Petitioner's argument as follows:

> **B. *Failure to Conduct Effective Interviews of Roger Williamson, Maria Creasy, and John Michael McKinnon***
> The Petitioner contends that his trial attorneys failed to conduct effective interviews of the Petitioner's parents and his mother's then-boyfriend. He claims that the witnesses would have assisted Dr. Montgomery's evaluation and supported the Petitioner's testimony.
>
> First, the Petitioner argues that his trial attorneys failed to conduct an adequate interview of his father, Roger Williamson. The Petitioner's father did not testify at the trial but did testify at the post-conviction hearing that he was present when the victim chased the Petitioner home after trying to run the Petitioner off the road. The Petitioner asserts that Mr. Williamson could have testified about the large size of the truck the victim drove, the victim's "cut[ting] the tailspin" in Mr. Williamson's driveway, and the Petitioner's "shaken" demeanor. Mr. Williamson also testified at the post-conviction hearing that the defense team never questioned him in detail about the Petitioner's background.
>
> Second, the Petitioner argues that his mother, Maria Creasy, was not adequately interviewed. Ms. Creasy did not testify at the trial. The Petitioner asserts that she could have provided relevant information about his childhood, the events before and after the shooting, and his relationship with Ms. Holmes. Regarding the Petitioner's history, he argues that Ms. Creasy could have testified about both his parents' alcoholism and the conflicts between the Petitioner and his father and that these facts contributed to a predisposition to PTSD. He notes Ms. Creasy's testimony at the post-conviction hearing about his starting a new job two days before the shooting and his being unreachable and unable to get out of bed the day before the shooting. He likewise notes her post-conviction testimony about his beer consumption on the day of the crime and his demeanor after the shooting.
>
> Third, the Petitioner argues that John Michael McKinnon was never interviewed about the events on the day of the crime but that he could have testified about the difficulties in the Petitioner and Ms. Holmes's relationship. The Petitioner notes that he was with Mr. McKinnon all day on the date of the crime and that Mr. McKinnon could have testified about their actions, including the amount of beer they drank after finishing work that afternoon.

The record reflects that both trial attorneys met with the Petitioner and that counsel spent a substantial amount of time reviewing the case with the Petitioner. Co-counsel retained investigative assistance early in the case, and Ms. Waltz met with the Petitioner about the facts of the case. Her written report reflects that the Petitioner told her about the incident in which the victim tried to run him off the road and about the conflict between himself and the victim due to the Petitioner's involvement with Ms. Holmes. By his own account, the Petitioner had two or three beers on the night of the crime, and counsel did did [*sic*] not think the Petitioner was intoxicated when the Petitioner turned himself in to the police.

Regarding the adequacy of the investigation, the post-conviction court found that the trial attorneys' testimony was credible regarding their knowledge of the case and preparedness. We acknowledge the court's adverse credibility determinations relative to co-counsel, particularly as regards his attorney's fees, but we note that the court separately credited his testimony regarding his knowledge of the case and trial preparation. We note that counsel's testimony provides some corroboration of co-counsel's preparation efforts. In addition, the court specifically noted and credited counsel's testimony that he knew the facts of the case. The court found that the Petitioner failed to prove by clear and convincing evidence that his attorneys' investigation, preparation, or trial performance was inadequate. The evidence does not preponderate against the court's findings. The Petitioner's attorneys were aware of the prior conflicts between the Petitioner and the victim and the Petitioner's related state of vigilance and fear. They had Ms. Waltz's report containing information about the incident in which the victim tried to run the Petitioner off the road and followed him home. They investigated the Petitioner's alcohol consumption by asking him how much he drank on the day of the crime, and his answer was consistent with counsel's personal observations of the Petitioner at the sheriff's department after the crime. The court noted that no proof had been offered to show that the Petitioner was intoxicated at the time of the shooting to the extent that it affected his ability to premeditate. The Petitioner has not shown that his trial attorneys' performance was deficient and that he was prejudiced by counsel's performance. He is not entitled to relief on this basis.

*Id.* at 425-426.

In the present case, Petitioner has not shown that the state courts contradicted or unreasonably applied clearly established federal law. As shown above, the Tennessee Court of Criminal Appeals found that, because Petitioner's counsel knew the facts of the case and conducted an investigation, "Petitioner failed to prove by clear and convincing evidence that his attorneys' investigation, preparation, or trial performance was inadequate." *Id.* at 426.

Additionally, the appellate court considered that "no proof had been offered to show that the

Petitioner was intoxicated at the time of the shooting to the extent that it affected his ability to premediate." *Id.* The appellate court then found that Petitioner had "not shown that his trial attorneys' performance was deficient and that he was prejudiced by counsel's performance." *Id.* Although Petitioner believes that his counsel should have conducted a more thorough investigation, he has not shown how the state courts contradicted or unreasonably applied the standard established in *Strickland* in finding that Petitioner's counsel was not deficient or that he was not prejudiced by their performance. Accordingly, Petitioner has not demonstrated an entitlement to habeas corpus relief under 28 U.S.C. § 2254(d)(1).

Petitioner's argument that the state courts' conclusions were based on an unreasonable application of the facts due to Mr. Preston's testimony lacking credibility is also without merit. As stated before, it is a rare occasion for a federal habeas court to overturn a state's determinations of credibility. *See Otte*, 654 F.3d at 601. As considered by the Court of Criminal Appeals, the trial court made separate credibility determinations in relation to Mr. Preston, and it found both "trial attorneys' testimony was credible regarding their knowledge of the case and preparedness." *Williamson v. State*, 476 S.W.3d at 425-426. Since the undersigned is bound by those reasonable credibility determinations, and, because Petitioner has not shown by clear and convincing evidence that the state courts unreasonably determined the facts relied on for their decisions, Petitioner has not shown an entitlement to habeas corpus relief under 28 U.S.C. § 2254(d)(2) on this ground.

Having reviewed the entire record in the present case, the undersigned finds that Petitioner did not meet his burden of establishing that the state courts' adjudication of his ineffective assistance of counsel claims were "contrary to, or involved an unreasonable application of, clearly established Federal law," nor did he show that the decision "was based on

an unreasonable determination of the facts in light of the evidence presented in State court proceeding." *See* § 2254(d)(1)-(2). Thus, Petitioner is not entitled to habeas corpus relief.

## IV. Recommendation

For the reasons discussed above, the undersigned recommends that habeas corpus relief be DENIED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

JEFFERY S. FRENSLEY
United States Magistrate Judge